388 So.2d 664 (1980)
STATE of Louisiana
v.
Timothy George BALDWIN.
No. 66033.
Supreme Court of Louisiana.
May 19, 1980.
Rehearing Denied October 6, 1980.
*668 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Johnny C. Parkerson, Dist. Atty., John R. Harrison, Asst. Dist. Atty., for plaintiff-appellee.
J. Randolph Smith and Gilmer P. Hingle, Smith & Hingle, Monroe, for defendant-appellant.
WATSON, Justice.[*]
Timothy George Baldwin and Marilyn Lee Hampton were indicted by a grand jury for the first degree murder of Mary James Peters, in violation of LSA-R.S. 14:30. The trials were served and Baldwin was found guilty. After the sentencing portion of his trial, the jury unanimously recommended *669 the death penalty. Two aggravating circumstances were found: that Baldwin was engaged in an armed robbery; and that the crime was committed in an especially heinous, atrocious and cruel manner. Defendant Baldwin has appealed, relying on forty assignments of error.

FACTS
Timothy Baldwin, his wife Rita, and their seven children were neighbors of Mary James Peters in West Monroe, Louisiana, from 1971 until 1977. She was godmother to their youngest son, Russell. During the latter part of their stay in West Monroe, William Odell Jones also resided with the Baldwins. The group went to Bossier City for six months and then moved to Ohio. The oldest daughter Michelle, remained in West Monroe with one brother. A second son entered the service. Marilyn Hampton and her three daughters stayed with the Baldwins in Ohio. Marilyn, Timothy Baldwin and her children then left, accompanied by Jones. Baldwin and Jones worked together in the business of installing aluminum siding. After the departure of her husband Rita Baldwin got in financial difficulties and was picked up on bad check charges. Her four younger children went to live with Michelle in West Monroe. Meanwhile, Timothy Baldwin, Jones, Marilyn Hampton and her three children led an itinerant existence. Their last means of transportation was a 1978 black Ford van, rented in Tampa, Florida. On April 4, 1978, Marilyn Hampton and Timothy Baldwin drove the van to West Monroe. Jones and the children stayed at a cabin in Holmes State Park, near Jackson, Mississippi. Baldwin and Marilyn Hampton visited Michelle's apartment in West Monroe but left there around 8:00 P.M. Shortly afterward, a van was seen parked in front of Mrs. Peters' house. A man and woman were observed leaving the residence between 10:00 and 11:00 P.M. Shortly before their departure, passerbys saw and heard indications that someone in the Peters' home was being beaten. Baldwin testified in his own behalf and admitted that he and Marilyn visited Mrs. Peters that evening, but denied the murder. Mrs. Peters, who was 85 years old, was beaten with various things, among them a skillet, a stool and a telephone. She remained on the kitchen floor overnight and was discovered the next morning shortly before noon by Elsie Mae Brice, an employee of the Ouachita Council Meals on Wheels, who was bringing her noon meal. Although helpless and incoherent, Mrs. Peters tried to defend herself against the police officers and the ambulance attendants who took her to the hospital. Dr. A. B. Gregory saw her in the emergency room around 12:30 P.M. on April 5, 1978, and found her semicomatose. Her left cheek bone and jaw bone were shattered; she had brain damage from multiple contusions and lacerations. According to Dr. Gregory, Mrs. Peters could not communicate rationally. She died the following day of the injuries. Dr. Frank Chin, who performed the autopsy, attributed her death to massive cerebral hemorrhage and swelling, secondary to external head injuries.
Timothy Baldwin and Marilyn Hampton were subsequently located in El Dorado, Arkansas. Timothy Baldwin signed consents for the search of their motel room and the van. Two blue bank bags, one empty and one containing savings bonds and certificates of deposit payable to Mary James were found in the van.[1] Jones, to whom Marilyn Hampton and Timothy Baldwin had made inculpatory statements both before and after the crime, helped police officers locate a safe which had belonged to the victim in the LaFourche Canal in West Monroe. Baldwin's finger and palm prints were found on various items in the Peters' home: a cigarette lighter, a television set and a coffee cup.

ASSIGNMENT OF ERROR NUMBER ONE
Defendant contends that the trial court erred in denying his motion for a change of venue. The evidence at the hearing on the motion was that the newspaper *670 coverage was routine for a murder case. A television story quoted the police chief as saying the crime was "savage" (Tr. 277) and a reporter characterized it as a "brutal slaying" (Tr. 278). However, these descriptions are not exaggerated. The lay witnesses at the hearing were generally unfamiliar with the crime although some had a sketchy impression about it from the news media. The only one who testified that the public had a preformed opinion about defendant's guilt was Ludvic Herlevic, who had known the victim all of his life and took her to church every Sunday. Defendant did not prove that there was such prejudice in the collective mind of the community that a fair trial was impossible. LSA-C.Cr.P. art. 622. There was no difficulty in securing an impartial jury. Although only three months elapsed between the murder and the trial, many of the prospective jurors were completely unaware of the crime. The severe offense apparently had little impact on the community. Only one challenge for cause was granted because the prospective juror had a preconceived idea about Baldwin's guilt. There was no basis for a change of venue and the trial court correctly denied the motion. State v. Clark, 340 So.2d 208 (La.1976); State v. Smith, 340 So.2d 222 (La.1976).
This assignment lacks merit.

ASSIGNMENTS OF ERROR NUMBER TWO, THREE AND FOUR
Defendant contends that the trial court should have allowed him to enter a plea of not guilty by reason of insanity; should have appointed a sanity commission and should have provided him with an expert psychiatrist at State expense. LSA-C. Cr.P. art. 561 provides that a defendant may withdraw a plea of not guilty and enter the alternate pleas of not guilty and not guilty by reason of insanity within ten days after arraignment, but the court may thereafter allow such a change "for good cause". The trial court found no cause for the change here. At the hearing on the motion for a change of plea, the only evidence of impaired mental capacity was testimony that Baldwin had been a heavy drinker. Compare State v. Taylor, 229 So.2d 95 (La.1970), where there was both lay and medical evidence of insanity. The trial court correctly concluded that there were no indicia of insanity, and no basis for the appointment of a psychiatrist or a sanity commission. LSA-C.Cr.P. art. 643; State v. Clark, 367 So.2d 311 (La.1979).
These assignments of error lack merit.

ASSIGNMENT OF ERROR NUMBER FIVE
Defendant objects to the trial court's denial of his motion to suppress the evidence seized from the Arkansas motel and the Ford van. There is no question that Baldwin was legally arrested pursuant to a valid warrant. At the hearing on the motion to suppress, four Louisiana detectives testified that Baldwin's written consents to the searches were given freely and voluntarily. Baldwin testified that he was not presented with a warrant for the searches. On cross-examination, he was asked to identify his signatures on the two documents giving permission for the searches and seizures. Counsel attempted to invoke Baldwin's Fifth Amendment privilege against self-incrimination, but the trial court required him to respond. By taking the stand at the suppression hearing, Baldwin subjected himself to cross-examination on the issues relevant to that hearing. State v. Lukefahr, 363 So.2d 661 (La. 1978). Any consent to the searches was relevant to the question of whether the evidence should have been suppressed. The trial court did not err in requiring Baldwin to identify his signatures. The State carried its burden of proving that Baldwin's consent to the searches was voluntary and uncoerced.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER SIX, SEVEN, EIGHT AND TEN
The defense exhausted its peremptory challenges and complains of the trial court's failure to excuse four prospective jurors for cause. The defense challenged all four peremptorily.
*671 It is contended that Ernest Stansel should have been excused because of his personal friendship with Carlton Traweek, a police officer who testified for the prosecution, and because he had a fixed opinion about defendant's guilt.
Although prospective juror Stansel had formed an opinion about defendant's guilt or innocence, he testified that this would not affect his decision and that he could be fair as a juror. Stansel said that his personal friendship with Traweek would not make him believe Traweek's testimony over that of any other witness and would not influence his verdict. Stansel testified that he could vote impartially after listening to the evidence.
It is also argued in brief that Stansel was a personal friend of investigator Charles Dortch, who assisted the prosecution, but Stansel's testimony was that he knew Dortch only to the extent of knowing who he was.
The relationship between Stansel and Traweek was not within the purview of LSA-C.Cr.P. art. 797(3).[2]State v. Watson, 301 So.2d 653 (La.1974). Stansel was competent to serve as a juror. LSA-C.Cr.P. art. 797(2).[3] There was no abuse of discretion in denial of the challenge for cause.
Defendant contends that prospective juror George A. Wood should have been excused because he had served as assistant chief of police for the City of Monroe. Although Wood had served twenty-one years with the Monroe Police Department, he said that he would be fair to both sides in his deliberations. He had been retired for sixteen years at the time of trial. He testified that he would not believe a police officer merely because he was an officer and that he would find defendant not guilty if he had a reasonable doubt in the matter. Woods had no particular connections with this defendant which would have made him ineligible to serve as a juror. Compare State v. McIntyre, 365 So.2d 1348 (La.1978). The trial court correctly found that Woods' testimony on voir dire showed that he would be a fair and impartial juror, despite his background in police work. See State v. Qualls, 353 So.2d 978 (La.1977).
Defendant contends that the trial court erred in failing to grant its challenge for cause of prospective juror Manning H. Kemp. Kemp's brother-in-law is a Monroe police officer and he is personally acquainted with other law enforcement people. Kemp stated that the relationship would not influence him but admitted that he would favor the testimony of a police officer over that of the defendant because police officers are trained observers, and have nothing to gain by giving false testimony. When examined by the court, Kemp said that he would give believable testimony from a stranger, which he had no reason to doubt, equal weight with that of a police officer. He testified that he had no preconceived notions about the case and could be a fair and impartial juror, free of any prejudice. Like the prospective juror in State v. Governor, 331 So.2d 443 (La.1976), Kemp said he would consider the testimony as a whole. He agreed that policemen can make mistakes and said he would not exclude testimony contra to that of a policeman.
Kemp was not unqualified to serve as a juror merely because he regarded policemen as trained observers. This does not imply that he would therefore accept their testimony without question. There was no abuse of discretion in refusal of the challenge for cause. State v. Allen, 380 So.2d 28 (La.1980).
*672 Both the State and the defense attempted to challenge prospective juror Vera Glass for cause: the State because of her views on capital punishment; and the defense because she thought an indictment was some indiction of guilt, tended to believe law enforcement officers over lay witnesses, and felt that defendant should testify in his own behalf. When the court instructed Ms. Glass that she could not consider the fact that defendant had been indicted as an indication of guilt, she answered that she would not. Ms. Glass' son had been a deputy and she knew other law enforcement officers. She tended to believe police officers because of her son's conscientious attitude about the law and admitted that past discussions with her son would probably affect her. Ms. Glass also admitted that the fact that she had an eighty-five year old mother might influence her and that she would always wonder why a defendant failed to testify. However, she responded to the court's rehabilitating questions correctly and stated that she could base her decision solely on the evidence presented and the instructions given by the court. Ms. Glass indicated that she would accept what the court told her regarding the weight to be given to the testimony, the presumption of innocence, and the defendant's constitutional right to refuse to testify. Her responses show no bias. Despite some confusion, she apparently understood the trial judge's instructions. She was able to extract the gist of his explanation that an indictment cannot be regarded as evidence of guilt and restate it in her own words (Tr. 843-844). Her comprehension was sufficient to make her a competent juror. Compare State v. Nolan, 341 So.2d 885 (La.1977). There was no abuse of discretion in the refusal to allow the challenge for cause.
These assignments of error lack merit.

ASSIGNMENT OF ERROR NUMBER NINE
Defendant contends that a mistrial should have been granted because one of the jurors, Judy Dell Puckett, perjured herself on voir dire. During the trial, it developed that Ms. Puckett knew District Attorney Parkerson and defendant contended that she had denied knowing anyone who worked in the district attorney's office. Ms. Puckett had first been asked on voir dire if she knew anyone in law enforcement. She replied that she did not know anyone currently with the Sheriff's Department. She was not asked if she knew anyone in the District Attorney's office, but only what contact she had had with that office in connection with the theft of her car. She replied that Deputy Gene Hatten took care of the matter and she did not talk to anyone else at the District Attorney's office on that occasion. No false statement was made by Judy Puckett. The trial court found no impediment to a fair trial and correctly denied the mistrial. State v. Forbes, 348 So.2d 983 (La.1977).
This assignment of error lacks merit.

ASSIGNMENTS OF ERROR NUMBER ELEVEN AND TWELVE
These assignments of error relate to allegedly prejudicial rulings relative to the examination of State witness Doris Ellen Baldwin. When the State tried to impeach Doris Baldwin's testimony, the trial court ruled that the State had failed to show either surprise or hostility. LSA-R.S. 15:487, 488. The trial court did, however, allow her to answer a question which was ruled "leading" and a question on re-direct examination which exceeded the subject matter of cross-examination.
Doris Baldwin initially testified that she had talked with Bill Jones on Thursday, April 6, but did not remember whether she had talked to her father that day or not. The State attempted to impeach her on the basis of a prior inconsistent statement. The court made an in camera examination of the statement and found no real inconsistency, but ruled that the State could clarify "hazy areas" (Tr. 1279). Ms. Baldwin was then asked:
"Miss Baldwin isn't it true that in fact you did receive a phone call from Bill and your father about 5:30 on the evening of Thursday ...". (Tr. 1282) *673 The court ruled that the question was leading but not objectionable or prejudicial. Doris Baldwin was allowed to answer yes. When she was queried as to the content of the conversation, the trial court sustained an objection. The trial court did not abuse its discretion in allowing the first question. LSA-R.S. 15:277 prohibits leading questions to one's own witness. Even if the question were leading in that it suggested the phone call had been received, allowing the witness to answer it did not prejudice defendant. State v. Quincy, 363 So.2d 647 (La.1978).
The State attempted to ask Ms. Baldwin whether she observed any injury to Barbara Hampton's face on Wednesday, April 6, and the trial court maintained an objection on the ground that the subject was not covered on cross-examination. LSA-R.S. 15:281. Counsel for the State then stated that he would recall the witness and defendant consented to the question. By consenting to the questioning, defense counsel waived his objection.
These assignments of error lack merit.

ASSIGNMENT OF ERROR NUMBER THIRTEEN
Defendant contends that the trial court erred in allowing irrelevant testimony of William Odell Jones in regard to the relationship between Marilyn Hampton and defendant. It is contended that defendant was placed in a bad moral light as one who left his wife for another woman. There is no basis for the contention because both Rita and Timothy Baldwin also testified about the relationship, and Jones' testimony did not add anything.
This assignment of error lacks merit.

ASSIGNMENTS OF ERROR NUMBER FOURTEEN, FIFTEEN, SIXTEEN, SEVENTEEN AND EIGHTEEN
These assignments of error are directed to the testimony of William Odell Jones that Timothy Baldwin told him he would kill Ms. James [the name by which he knew Ms. Peters] if necessary to get her money. The hearsay testimony was allowed to show defendant's specific intent to murder the victim. LSA-R.S. 15:446. The statements were unquestionably voluntary. Defendant received pre-trial notice that the statements would be used in evidence, and the statements were admissible to prove Baldwin's motive and intention. State v. Weedon, 342 So.2d 642 (La.1977). They showed Baldwin's state of mind immediately prior to the murder.
These assignments of error lack merit.
ASSIGNMENTS OF ERROR NUMBER NINETEEN, TWENTY, TWENTY-ONE, TWENTY-TWO, TWENTY-THREE, TWENTY-FOUR, TWENTY-FIVE, TWENTY-SEVEN, AND TWENTY-EIGHT
Defendant contends that testimony about his arrest in Arkansas and the searches should not have been allowed because there was no probable cause for his arrest, and the searches of the motel room and the van were illegal. Since the arrest was legal and he consented to the resulting searches and seizures, testimony about the circumstances was clearly admissible.
These assignments of error lack merit.

ASSIGNMENT OF ERROR NUMBER TWENTY-SIX
Defendant complains that the trial court erred in denying a mistrial when the prosecuting attorney alluded to an appeal.
Defense counsel repeatedly objected to the testimony from the Arkansas deputies and others about the circumstances surrounding the arrest, searches and seizures. In response to one of these objections, the prosecution stated, "... counsel has reserved his rights for appeal, ...". (Tr. 1432) It is contended that the remark was improper and prejudicial, indicating to the jury that defendant would be convicted and would then appeal. Further, it is argued that the jury would regard the appellate process as another type of trial rather than a review of the record and the remark might induce them to convict the defendant because there would be another trial of his *674 guilt or innocence. LSA-C.Cr.P. art. 775 provides in pertinent part:
"Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771."
The trial court in its per curiam noted that in its opinion the word appeal did not necessarily connote a guilty verdict in the minds of the jurors. The trial court stated at the time that he did not feel the remark prejudiced defendant, but offered to admonish the jury. Defense counsel declined the admonishment on the ground that it would merely draw attention to the word appeal.
Mere use of the word appeal does not have the prejudicial effect argued by defense counsel. The trial court stated in its per curiam that the jurors' understanding of the judicial process was such that they would probably expect an appeal to result from a trial in all circumstances. The trial court did not feel the word necessarily connoted a conviction or guilty verdict. The remark is not within those enumerated in LSA-C.Cr.P. art. 770 as mandating a mistrial. It is only when the prejudice created by a remark prevents a fair trial and an admonition is insufficient that a mistrial should be ordered. LSA-C.Cr.P. art. 771. An admonition would have been sufficient here. Since defendant declined to request one, he cannot complain of any prejudice resulting from its omission. The drastic remedy of a mistrial was not warranted. State v. Heads, 370 So.2d 564 (La.1979); State v. Matthews, 354 So.2d 552 (La.1978). It is unlikely that the jury was aware that there is an appeal only from a conviction. No substantial prejudice was demonstrated.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER TWENTY-NINE
Defense counsel objects to the State being allowed to recall a witness to elicit testimony which exceeded the scope of cross-examination. LSA-R.S. 15:281 places the scope of redirect examination within the trial judge's discretion, and LSA-C.Cr.P. art. 765(5) allows the trial court to permit additional evidence prior to argument.
There was no error in allowing the witness to be recalled and defense counsel waived his right to further examination of the witness by stating "that's all we have" (Tr. 1482).
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER THIRTY
It is contended that the trial court erred in allowing Detective Larry Norris to testify as an expert in fingerprint identification. Norris had been the fingerprint officer for the West Monroe police department for eighteen months and had worked in the development of latent fingerprints for six years. He had specialized in comparison of latent fingerprints for fourteen months prior to trial and had attended various special schools: the Law Enforcement Training Academy at LSU in Baton Rouge; the F.B.I. School at LSU; and the F.B.I. Academy in Quantico, Virginia. See State v. Lewis, 351 So.2d 1193 (La.1977); State v. Madison, 345 So.2d 485 (La.1977); and State v. Overton, 337 So.2d 1201 (La.1976). Norris' testimony shows complete familiarity and knowledge of the subject of fingerprint identification. The trial court did not err in accepting him as an expert in the field of fingerprint identification.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER THIRTY-ONE
Defendant complains about the admission in evidence of Exhibit S-34, a photographic enlargement of a latent palm print found on a cigarette lighter at the scene of the crime and a photographic enlargement of defendant's palm. The exhibit enlarged the photographs to enable the jury to make a visual comparison. A photograph which is otherwise admissible should *675 not be excluded merely because presented in an enlarged form. It is only when the enlargement misrepresents the evidence that such a photograph should be excluded. It is contended that the enlarged prints are not the best evidence because of distortion, but the claim that the enlargements distort the evidence is not substantiated in any particular.
This assignment of error lacks merit.

ASSIGNMENTS OF ERROR NUMBER THIRTY-TWO AND THIRTY-THREE
Defendant contends that he was prejudiced by the State's failure to allow pretrial examination of photographs taken at the site where the safe was found in the LaFourche Canal. Counsel for defendant moved for a mistrial, and the motion was denied. The court allowed defense counsel to view the photographs during a trial recess. A motion was then made to exclude the pictures and all testimony concerning them because of the State's failure to disclose them prior to trial. LSA-C.Cr.P. art. 729.5. The trial court ruled that there was no prejudice to the defense and allowed the evidence to be admitted.
The photographs were taken on the morning of the day they were introduced into evidence and could not have been made available prior to trial. The recess to enable defense counsel to examine the evidence cured any surprise and eliminated the necessity of the evidence being excluded. The photographs themselves were not inflammatory or prejudicial; they merely illustrated the scene where the safe was discovered. Allowing defense counsel to view the photographs prior to their introduction was sufficient to assure a fair trial. The trial court found no evidence of bad faith on the part of the State, and there was no abuse of discretion in allowing the photographs into evidence.
These assignments of error lack merit.

ASSIGNMENT OF ERROR NUMBER THIRTY-FOUR
Defense counsel moved to exclude testimony by District Attorney Parkerson on the ground that he did not appear on the State's original witness list, and the trial court denied the motion. This is assigned as error.
District Attorney Parkerson was called to rebut an inference of immunity to witness Jones. The State did not know his presence was necessary until the immunity issue was raised, and he was not sequestered. There was no abuse of discretion in allowing the witness to testify. LSA-C.Cr.P. art. 764; State v. Bell, 346 So.2d 1090 (La.1977). The contention that the testimony of a public figure creates an impression of guilt is not justified here, where the only subject was immunity for Jones. Nothing in the testimony indicates a personal belief in defendant's guilt or would create that impression in others.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER THIRTY-FIVE
Defendant objects to admission into evidence of various State exhibits.
A black and white photograph of the victim is allegedly more prejudicial than probative. The photograph (S-16G) shows the extent of the injuries, the identity of the victim and the probable cause of death. It is unpleasant but not gruesome. The probative value outweighs any prejudice. State v. Trass, 347 So.2d 1156 (La.1977).
Other objects were objected to on the ground of improper identification and an improper chain of custody. These contentions are unfounded.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER THIRTY-SIX
Defendant complains that the trial court erred in refusing to give requested special charge, number 3 as follows:
"The prosecution must prove beyond a reasonable doubt, not only that the offense was committed as alleged in the indictment, but that the defendant was the person who committed it. You must *676 be satisfied beyond a reasonable doubt of the accuracy and correctness of the identification of the defendant before you may convict him.
"You are further instructed that it is not necessary for the defendant to prove that another person may have committed the crime; if the circumstances of the identification are not convincing beyond a reasonable doubt, you must find the defendant not guilty." (Tr. 148, 149)
The trial court concludes that the charge was covered by the general charges which stated in pertinent part:
"If you entertain any reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your sworn duty to give him the benefit of that doubt and to return a verdict of acquittal." (Tr. 152)
"[If] you find the evidence unsatisfactory upon any single point indispensably necessary to constitute the accused's guilt, this would give rise to such a reasonable doubt as would justify you in rendering a verdict of not guilty." (Tr. 153)
The general charges made it clear to the jury that every element of the crime including the identity of the defendant had to be proven. State v. Stewart, 357 So.2d 1111 (La.1978).
This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER THIRTY-SEVEN
Defendant contends that the trial court should have given requested special charges relating to the plea of not guilty by reason of insanity. Since there was no plea of not guilty by reason of insanity, the charges were inappropriate and correctly denied. LSA-C.Cr.P. art. 803.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER THIRTY-EIGHT
Defendant contends that the trial court should have granted a motion for new trial on the ground that there was no evidence of specific intent at the time of the crime. It is contended that defendant may not have realized the consequences of his act because of his mental state or intoxicated condition. The evidence does not establish that defendant was too intoxicated to realize what he was doing at the time the crime was committed, and there is ample evidence of the requisite specific intent at the time the crime was committed.
This assignment of error lacks merit.

ASSIGNMENTS OF ERROR NUMBER THIRTY-NINE AND FORTY
Defendant contends that the trial court should have granted his motion to arrest judgment and erred in overruling his objection to imposition of sentence.
The State rested its case at the sentencing hearing on the trial testimony. No additional evidence was presented to show the cruel nature of the offense. Consequently, it is contended that evidence of heinousness was introduced at the guilt portion of the trial in violation of State v. Payton, 361 So.2d 866 (La.1978).
Because of the particular nature of this crime, the evidence of the cause of death necessarily included some description of Ms. Peters' physical condition. An inference would arise that the crime was a cruel one, but this is not because any effort was made by the State to stress this aspect of the matter. Evidence of the cause of death was admissible and in itself showed the crime to have caused great pain and suffering.
At sentencing, the jury found two aggravating circumstances. The jury was charged as to the statutory mitigating circumstances and there is no reason to believe that these were not properly considered since the verdict states that the recommendation was made "after consideration of the mitigating circumstances" (Tr. 162).
The evidence supports the jury's conclusion that the crime was committed during an armed robbery and that the offense was committed in an especially cruel manner.
These assignments of error lack merit.

*677 SENTENCE REVIEW
Art. 1, § 20 of the Louisiana Constitution of 1974 prohibits excessive punishment. LSA-C.Cr.P. art. 905.9 mandates that each death sentence be reviewed to determine if it is excessive under the circumstances. The criteria for review are:
"(a) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factors, and
"(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
"(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
A. PASSION, PREJUDICE OR OTHER ARBITRARY FACTORS
There is no evidence that Baldwin's sentence was imposed because of passion, prejudice or other arbitrary factors.
B. AGGRAVATING CIRCUMSTANCES
(1) Armed Robbery
Timothy Baldwin admitted that he was carrying a knife when he went to Ms. Peters' house the night of the murder. The knife did not show any evidence of blood, but the other items used to beat Ms. Peters were dangerous weapons in the manner used. State v. Bonier, 367 So.2d 824 (La. 1979); LSA-R.S. 14:2(3). The safe and its contents which were taken from the premises were in Ms. Peters' immediate control, though not on her person. The fact that the safe was taken from the bedroom and Ms. Peters was beaten in the kitchen is immaterial. The property was in Ms. Peters' home and under her control. State v. Verret, 174 La. 1059, 142 So. 688 (1932).
There is no doubt that Baldwin was engaged in an armed robbery when he killed Ms. Peters. The jury correctly found that statutory aggravating circumstance to be present. LSA-C.Cr.P. art. 905.4(a).
(2) Cruelty
An especially cruel murder is one that causes death in a particularly painful and inhuman manner. While this aggravating circumstance necessarily involved some degree of subjectivity, the facts reflect that Ms. Peters was severely beaten with various objects including a skillet, a stool and a telephone, and left to die a lingering death. There can be no question that a prolonged beating is an especially cruel way to commit murder. This is particularly true when the blows are inflicted upon an aged female, who is unable to effectively resist. Ms. Peters' feeble effort to fight her rescuers shows that she was conscious on some level of the need to defend herself. Unable to summon help, she had remained in terror for approximately twelve hours before she was discovered. The record does not clearly show whether Baldwin was aware that he had left Ms. Peters to die a slow death. Undoubtedly he assumed she could not survive his merciless beating or he would not have left her with the possibility of later identifying him. However, he made no effort to end her miserable and suffering condition. His action was atrocious in that it violates the bounds of common decency. The jury correctly found that this murder was committed in an especially heinous, atrocious and cruel manner. LSA-C.Cr.P. art. 905.4(g).
The evidence supports both of the statutory aggravating circumstances found by the jury.

C. DISPROPORTIONATE SENTENCE
The sentence review memorandum on behalf of the State of Louisiana shows two other first degree murder convictions in Ouachita Parish between January 1, 1976, and September 5, 1978. One defendant, Charlie Lee Carter, was sentenced to life imprisonment and the other, Dalton Prejean, was given the death penalty. Charlie Lee Carter was a twenty-six year old male, who murdered Alfred C. Carter with a pistol. There were no aggravating circumstances and the jury recommended the lesser penalty of life imprisonment. Dalton *678 Prejean, aged seventeen, killed police officer Donald Cleveland with a revolver. The aggravating circumstance was that the victim was a peace officer engaged in his lawful duties. LSA-C.Cr.P. art. 905.4(b). Despite the mitigating circumstance of Prejean's youth, he received the death penalty. LSA-C.Cr.P. art. 905.5(f).
Considering this sentence in relation to the mitigating circumstances in LSA-C. Cr.P. art. 905.5, the Post Sentence Report shows that Baldwin has a prior history of criminal activity commencing at an early age.
There is no evidence that the crime was committed under the influence of mental or emotional disturbance. Dr. John N. Ritchey and Dr. Merritt N. Dearman, a psychiatrist, concluded that Baldwin did not have any mental disorder which prevented him from understanding the proceedings against him and assisting counsel in his defense. Neither doctor found a psychiatric illness or any evidence to suggest a history of psychosis. Dr. Ritchey stated that Baldwin has a "Character Disorder" but no mental impairment. Dr. Dearman felt that Baldwin falls into the category of a "socio-pathic personality, anti-social type."
There is no evidence that Baldwin was under the influence of another person when the crime was committed. On the contrary, he has a strong personality and was a leader rather than a follower, as in his relationship with Jones.
Baldwin did not claim any extenuation for his conduct. Although he denied the crime in interviews with the two physicians, he admitted that Ms. Peters endured "a very brutal death".
There is evidence that Baldwin was drinking on the evening of the crime, but nothing to suggest that his intoxication was such that he was unaware of what he was doing. Far from exhibiting a mental defect, Baldwin is of above average intelligence and claimed an I.Q. of 147.
Dr. Dearman gave Baldwin's date of birth as September 17, 1937, and the Post Sentence Report gives his date of birth as September 17, 1942. Regardless of which is correct, he is a mature man with a large family and not a youthful offender.
There is no evidence that Baldwin's participation in the crime was minor. Although the testimony of his wife and two of his children indicate that Baldwin was at one time a good husband and father this was not the case for a long time prior to the murder. He had left his wife and family, and was not supporting them. It is contended that his high I.Q. would enrich the prison community, but, in view of the doctors' evaluation of his personality, it is doubtful that this would be the case.
The record does not establish that Baldwin's death sentence is disproportionate when viewed in comparison with that meted out for similar crimes or that the sentence is excessive.
For the reasons assigned, the conviction and sentence are affirmed.
AFFIRMED.
DENNIS, J., concurs with reasons.
DENNIS, Justice, concurring.
I respectfully concur.
I remain of the belief that our scheme for review of the proportionality of the imposition of the death penalty is constitutionally flawed in not mandating statewide review of the sentences imposed in similar cases. See State v. Prejean, 379 So.2d 240, 249 (La.1980) (dissenting from denial of rehearing). However, the extraordinary deliberateness and brutality of this murder of an 84-year old woman for her valuables clearly justifies the death penalty without need of extensive comparison with other offenses.
NOTES
[*] Honorable Richard H. Gauthier participated in this decision as Associate Justice Ad Hoc.
[1] Mary James was the victim's name prior to her last marriage.
[2] LSA-C.Cr.P. art. 797(3) provides:

"The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, and the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;".
[3] LSA-C.Cr.P. art. 797(2) provides:

"The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;".