Timothy George **BALDWIN,**
Petitioner-Appellant,

v.

Frank C. **BLACKBURN,** Warden, Louisiana State Penitentiary, and William J. Guste, Jr., Attorney General, State of Louisiana, Respondents-Appellees.

No. 81-3249.

United States Court of Appeals,
Fifth Circuit.
Unit A

Aug. 14, 1981.

Calvin Johnson, Dwight Doskey, New Orleans, La., for petitioner-appellant.

John Harrison, Asst. Dist. Atty., Lavalle B. Salomon, Monroe, La., for respondents-appellees.

Before WISDOM, GEE and POLITZ, Circuit Judges.

GEE, Circuit Judge:

The facts in this case, as elaborated by the Louisiana Supreme Court on direct appeal, *State v. Baldwin*, 388 So.2d 664, 669 (La.1980), are not in dispute.

### Facts

Timothy Baldwin, his wife Rita, and their seven children were neighbors of Mary James Peters in West Monroe, Louisiana, from 1971 until 1977. Mrs. Peters was godmother to their youngest, Russell. During the latter part of their stay in West Monroe, William Odell Jones also resided with the Baldwins. The group went to Bossier City for six months and then moved to Ohio. The oldest daughter, Michelle, remained in West Monroe with one brother. A second son entered the service. Marilyn Hampton and her three daughters stayed with the Baldwins in Ohio. Marilyn, Timothy Baldwin, and her children then left, accompanied by Jones. Baldwin and Jones worked together in the business of installing aluminum siding. After the departure of her husband, Rita Baldwin got in financial difficulties and was picked up on bad check charges. Her four younger children went to live with Michelle in West Monroe. Meanwhile, Timothy Baldwin, Jones, Marilyn Hampton and her three children led an itinerant existence. Their last means of transportation was a 1978 black Ford van, rented in Tampa, Florida.

On April 4, 1978, Marilyn Hampton and Timothy Baldwin drove the van to West Monroe. Jones and the children stayed at a cabin in Holmes State Park, near Jackson, Mississippi. Baldwin and Marilyn Hampton visited Michelle's apartment in West Monroe but left there around 8:00 p. m. Shortly thereafter, a van was seen parked in front of Mrs. Peters' house. A man and woman were observed leaving the residence between 10:00 and 11:00 p. m. Shortly before their departure, passersby saw and heard indications that someone in the Pe-

ters' home was being beaten. Baldwin testified in his own behalf and admitted that he and Marilyn visited Mrs. Peters that evening but denied the murder. Mrs. Peters, who was 85 years old, was beaten with various things, among them a skillet, a stool, and a telephone. She remained on the kitchen floor overnight and was discovered the next morning shortly before noon by an employee of the Ouachita Council Meals on Wheels, who was bringing her noon meal. Although helpless and incoherent, Mrs. Peters tried to defend herself against the police officers and the ambulance attendant who took her to the hospital. Dr. A. B. Gregory saw her in the emergency room around 12:30 p. m. on April 5, 1978, and found her semi-comatose. Her left cheekbone and jawbone were shattered; she had brain damage from multiple contusions and lacerations. According to Dr. Gregory, Mrs. Peters could not communicate rationally. She died of the injuries the following day. Dr. Frank Chin, who performed the autopsy, attributed her death to massive cerebral hemorrhage and swelling, secondary to external head injuries.

Timothy Baldwin and Marilyn Hampton were subsequently located in El Dorado, Arkansas. Timothy Baldwin signed consents for the search of their motel room and the van. Two blue bank bags, one empty and one containing savings bonds and certificates of deposit payable to Mary James, were found in the van.[1] Jones, to whom Marilyn Hampton and Timothy Baldwin had made inculpatory statements both before and after the crime, helped police officers locate a safe that had belonged to the victim in the LaFourche Canal in West Monroe. Baldwin's finger and palm prints were found on various items in the Peters' home: a cigarette lighter, a television set, and a coffee cup.

Baldwin was found guilty, and the jury recommended the death sentence, finding two aggravating circumstances: "1. the offender was engaged in the perpetration or

---

1. Mary James was the victim's name prior to her last marriage.

attempted perpetration of an armed robbery [appellant had a knife on his person] and 2. the offense was committed in an especially heinous, atrocious or cruel manner." The Louisiana Supreme Court affirmed the conviction and denied rehearing. The United States Supreme Court denied certiorari on January 12, 1981. *Baldwin v. Louisiana,* 449 U.S. 1103, 101 S.Ct. 901, 66 L.Ed.2d 830 (1981). Appellant's execution was scheduled for March 31, 1981. He then sought post-conviction relief, which was denied for lack of jurisdiction by the state district court on March 26, 1981, and denied by the Louisiana Supreme Court without written reasons on March 27, 1981. Appellant immediately filed a petition for writ of habeas corpus in federal district court and was granted a stay of execution on March 27, 1981. The district court denied relief without an evidentiary hearing and ordered the stay dissolved as of May 4, 1981.

### Denial of Effective Counsel

Appellant asserts that the district court erred in finding, without holding an evidentiary hearing, that trial counsel was not ineffective. This issue was not raised on direct appeal but was raised in appellant's state petitions for post-conviction relief and denied without a hearing. Appellant first argues that counsel was ineffective for failing to pursue a consistent defense strategy, asserting that counsel's questioning on voir dire evidenced an intent to pursue an intoxication defense, which was not developed at trial and was abandoned in the jury charge.

Before trial, counsel moved to change the plea to guilty by reason of insanity based in part on appellant's heavy drinking. *See State v. Baldwin,* 388 So.2d at 670. Counsel questioned prospective jurors about their understanding of the concept of specific intent and their feelings about alcohol consumption. Counsel's opening and closing remarks are not included in the transcript, and their content is unknown; but appellant did cross-examine two state witnesses about their knowledge of appellant's increasing use of alcohol over the years and his extensive drinking on the day of the murder. Appellant's wife was called to testify about his increasing use of alcohol, and appellant testified at length about his drinking on the day of the murder. On cross-examination, appellant admitted that, although drunk, he was fully conscious of his activities on the night of the murder. Counsel subsequently agreed to deletion of the intoxication defense from the jury charge. Counsel then argued on motion for new trial that appellant's mental state or intoxicated condition precluded specific intent. *See id.* at 676. As the state asserts, appellant also defended on the theory that he had visited in the victim's home but left without committing the murder.

 The Sixth Amendment entitles a criminal defendant to counsel reasonably likely to render and rendering reasonably effective assistance. Effective assistance is not tantamount to errorless assistance or counsel judged ineffective by hindsight. The methodology for applying the standard involves an inquiry into the actual performance of counsel and a determination based on the totality of the circumstances and the entire record. *Nelson v. Estelle,* 642 F.2d 903, 906 (5th Cir. 1981). "Informed evaluation of potential defenses to criminal charges and meaningful discussion with one's client of the realities of his case are cornerstones of effective assistance of counsel." *Gaines v. Hopper,* 575 F.2d 1147, 1149–50 (5th Cir. 1978). But tactical decisions do not render assistance ineffective simply because in retrospect it is apparent that counsel chose the wrong course. *Beckham v. Wainwright,* 639 F.2d 262, 265 (5th Cir. 1981).

 The district court below considered "the evidence, the character of the defendant, and the circumstances of the crime." It noted that Baldwin had been represented by two experienced criminal lawyers who engaged in three months of pretrial preparation, numerous substantive motions, a five-day trial, and extensive post-trial litigation. The district court found counsel reasonable effective and refused to scrutinize counsel's decision not to develop further the intoxication defense. We conclude

that it was not error for the district court to deny an evidentiary hearing while finding that counsel's assistance at trial had been effective. This court has remanded for an evidentiary hearing when it could not conclusively determine from the record the accuracy of a petitioner's allegations of ineffective assistance. *See Clark v. Blackburn*, 619 F.2d 431, 432 (5th Cir. 1980). "The district court should hold a full hearing on any issues not resolved because of an insufficient record." *Id.* at 434. Here appellant does not raise allegations that require reference outside the record. *Compare Harris v. Oliver*, 645 F.2d 327, 331 (5th Cir. 1981) (record presented sharp conflicts of evidence requiring credibility choices), *with Williams v. Blackburn*, 649 F.2d 1019 (5th Cir. 1981) (evidentiary hearing unnecessary since district court had full record).

■ Where a petitioner can point to specific incidents of ineffectiveness, this circuit does not hesitate to grant a new trial or a hearing, but it does not blindly accept speculative and inconcrete claims. *United States v. Gray*, 565 F.2d 881, 887 (5th Cir.), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1587, 55 L.Ed.2d 807 (1978). Here appellant has failed to produce evidence to support a federal constitutional deprivation. The burden of proof is on the petitioner in a habeas corpus proceeding. *Jones v. Estelle*, 632 F.2d 490, 492 (5th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 1992, 68 L.Ed.2d 307 (1981). Appellant's case was difficult to defend, considering the evidence of fingerprints in the victim's home, the victim's property found in appellant's van, and the testimony of Jones that appellant had said he would kill the victim if necessary in order to get her money. Appellant precipitated the abandonment of the intoxication defense when he testified on cross-examination that he was fully conscious of his activities on the night of the murder. Counsel's only asserted alternative strategy would have been to pursue an "arguable defense of alibi." This alibi defense is discussed below and is without merit. Appellant has failed to meet his burden of alleging facts to support the grant of an evidentiary hearing. *See Rutledge v. Wainwright*, 625 F.2d

1200, 1205 (5th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 1746, 68 L.Ed.2d 229 (1981).

■ The second basis for appellant's assertion of ineffective assistance of counsel is counsel's failure to move for a new trial despite newly discovered evidence. Five months after trial, counsel acquired a motel receipt indicating that appellant was in El Dorado, Arkansas, some 70 miles away, on the night of the murder. The district court did not investigate this allegation, simply assuming that counsel would have developed any adequate alibi defense after exerting the effort to uncover the evidence. Although under other circumstances the failure to grant a hearing on this allegation might have constituted error, our review of the record indicates that appellant's counsel did not further develop the new evidence probably because it did not provide the appellant with an adequate alibi. Appellant testified at trial that he left the victim's house and that he and Mrs. Hampton drove to an El Dorado motel that night. Appellant does not assert that the motel receipt indicates a check-in time inconsistent with appellant's presence in the victim's house between 10:00 and 11:00 p. m., the time of the murder. *State v. Baldwin*, 388 So.2d at 669. Even if this court were inclined to second guess appellant's trial counsel, this allegation is without merit.

*Violation of State Sequestration Laws*

Appellant asserts that the trial judge did not instruct the last seven jurors concerning sequestration and allowed the jurors to go to a concession stand in the courthouse lobby during trial, possibly unescorted. After the first day of voir dire, the court excused the remaining prospective jurors for the night, noting the existence of publicity about the case and instructing them not to expose themselves to any information that might influence them. The court then addressed the five selected jurors and instructed them not to discuss the case with anyone, listen to any discussions, or discuss the case among themselves. The record

does not conclusively indicate whether the entire panel heard the last instruction. The following morning, defense counsel moved to have the remaining panel members polled concerning a newspaper article about the case. The story mentioned a safe, the significance of which was unknown to the general public, a pre-psychiatric stress test, and appellant's volunteering to take a lie detector test over his counsel's objections. Appellant's request was granted, and the remaining panel members were individually asked, out of the presence of the selected jurors, whether they had read the story. The trial court then found that three of the sixteen panel members had come into contact with some form of news media and that those three stated they did not have a different opinion after the exposure and that the jury panel had not been tainted by the exposure. Appellant's counsel stated no objection to this ruling, and it is not challenged on appeal. Appellant admits that no objection was made to the failure to instruct the last seven jurors concerning sequestration or their trip to the concession stand.

▪ Appellant's exclusive reliance on Louisiana's strict sequestration requirements in capital cases is misplaced. In habeas proceedings, the federal courts sit to determine whether there has been a constitutional infraction of the appellant's due process rights that would render the trial as a whole "fundamentally unfair," not to enforce state procedural rules. *Nelson v. Estelle*, 642 F.2d 903, 906 (5th Cir. 1981). "[F]ederal habeas corpus relief is available only for the vindication of rights existing under federal law; not rights existing solely under the rules of state procedure." *Id.* at 905–06; *Stewart v. Estelle*, 634 F.2d 998, 999 (5th Cir. 1980). "The constitutional standard of fairness requires that a defendant have 'a panel of impartial, indifferent jurors.'" *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975) (quoting *Irvin v. Dodd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

▪ Appellant asserts no prejudice from the brief jury separation and appears to request an evidentiary hearing in order to ascertain whether prejudice existed. Prejudice is presumed in habeas cases only when pretrial publicity is so pervasive and expressly prejudicial that the community is prejudiced. *United States v. Williams*, 568 F.2d 464 (5th Cir. 1978) (direct appeal discussing confusion of federal and constitutional standards); *United States v. Herring*, 568 F.2d 1099, 1103 (5th Cir. 1978) (direct appeal consciously applying due process principles). The standard of review, at least on direct appeal, is stricter for publicity during trial than for pretrial publicity, and principles from the two types of cases must not be allowed to overlap haphazardly. *Williams*, 568 F.2d at 468. Juror exposure to news accounts of the crime with which defendant is charged does not, standing alone, presumptively deprive the defendant of due process. *Murphy v. Florida, supra* 421 U.S. at 799, 95 S.Ct. at 2035. Appellant has not demonstrated and the record does not suggest such a degree of prejudicial pretrial publicity as would support a presumption of prejudice. *See Mayola v. State of Alabama*, 623 F.2d 992, 996–98 (5th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981) (appellant seeking nullification of conviction must demonstrate an "actual, identifiable prejudice attributable to that publicity on the part of members of his jury"). Appellant has shown no constitutional violation in the jurors' trip to the concession stand. Indeed, it has been held that the decision to sequester the jury lies within the sound discretion of the trial court. *Mastrain v. McManus*, 554 F.2d 813, 818 (8th Cir.), *cert.denied*, 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977) (denial of motion to sequester jury in first degree murder case; no state requirement involved).

▪ Appellant's other allegation of error, failure to instruct the last seven jurors not to discuss the case with anyone, must also fail absent alleged prejudice. *Rotolo v. United States*, 404 F.2d 316, 317 (5th Cir. 1968) (failure of trial judge to admonish jury not to discuss case prior to lunch recess did not constitute reversible error absent

allegation of actual prejudice). Appellant has thus failed to allege a federal constitutional violation, and the denial of his petition on this basis without evidentiary hearing was not error.

*Jury Instructions on Substantive Crime*

 The appellant next challenges the jury instructions. In brief, the appellant argues that the instructions given the Louisiana jury that convicted and sentenced him to death were inaccurate, confusing and incomplete, thus denying him due process. He argues that the instructions substantially undermined the reliability of the jury's determinations and created an impermissible risk that the jury had not found every element of the crime beyond a reasonable doubt. This claim presents a more difficult issue than those discussed above. While the decision to punish certain conduct as a state crime and the determination of the constituent elements of such crimes are largely left to the legislatures and courts of the various states, due process requires that convictions under those laws not be arbitrarily or confusedly obtained. If the instructions given the jury were likely to cause an imprecise, arbitrary, or insupportable finding of guilt on the charge of first degree murder, then the defendant may be entitled to habeas relief. The legal background for the appellant's claim must be explained.

Spurred by the United States Supreme Court decision in *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), holding that Louisiana's efforts to reinstitute the death penalty consistent with the principles of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), had failed, the State of Louisiana amended its statutes on murder and its capital sentencing procedures in 1976 and 1977. First degree murder was defined at the time of the appellant's trial as a homicide committed with specific intent to kill or to inflict great bodily harm. La.R.S. 14:30. Second degree murder was then defined in part as "the killing of a human being when the offender has a specific intent to kill, under circumstances that would be first degree murder under Article 30, but the killing is accomplished without any of the aggravating circumstances listed in Article 905.4 of the Louisiana Code of Criminal Procedure." La.R.S. 14:30.1(B) (1977). Those "aggravating circumstances," the absence of which negatively defined second degree murder, normally played a role in the second part of the first degree murder trial. Once a defendant was found guilty of murder in the first degree, a sentencing hearing was held before the convicting jury. If the jury unanimously found at least one of article 905.4's aggravating circumstances (defendant engaged in perpetration of aggravated rape, aggravated kidnapping, aggravated burglary, or armed robbery; victim a firefighter or a peace officer on duty; defendant previously convicted of an unrelated murder, aggravated rape, or aggravated kidnapping; defendant knowingly created a risk of death or harm to more than one person; defendant was offered or given anything of value for commission of crime; defendant at time of offense was imprisoned for another unrelated forcible felony; offense was committed "in an especially heinous, atrocious or cruel manner"), it could, but did not have to, unanimously impose the death penalty; alternatively, the jury could unanimously choose life imprisonment. If the jury could not reach unanimity on the sentence, the trial judge was obligated to impose a life sentence on the defendant. Much of the above scheme is still in place in Louisiana, but the state supreme court opinion in *State v. Payton*, 361 So.2d 866 (La.1978), and the consequent statutory amendments have altered the definitions of first and second degree murder.

In its *Payton* opinion, the Louisiana Supreme Court purported to decide what the state legislature had really meant in its statutory definitions of murder. "By defining second degree murder as an unaggravated, specific intent homicide, the legislature clearly intended by implication to remove this type of conduct from the definition of first degree murder and to redefine the capital offense as a specific intent homicide accomplished with a statutorily pre-

scribed aggravating circumstance." *Id.* at 870. All seven of the aggravating circumstances prescribed in article 905.4 for consideration of imposition of the death penalty were not properly, despite the language of the second degree murder statute, to be considered as part of the proof of first degree murder. The conviction of a defendant of other violent crimes was not a circumstance related to the commission of the homicide and thus was not a circumstance whose showing was sufficient for a finding of first degree murder. Also, the particular heinous or cruel nature of the crime, while related to the offense at issue, was deemed intolerably prejudicial to the fair determination of guilt/innocence. The court, then, redefined first degree murder in Louisiana as a homicide committed with a specific intent to kill or inflict great bodily harm with the presence of one or more of the remaining aggravating circumstances in article 905.4. *Id.* at 872.

The sentencing stage remains the same as before *Payton.* At this stage the jury still focuses on all the aggravating circumstances, including prior convictions for unrelated murder, aggravated rape, or aggravated kidnapping, and the "heinous, atrocious or cruel" nature of the offense in order to determine punishment. As mentioned above, the legislature has amended the statute to comply substantially with the court's opinion.

Under *Payton,* then, a Louisiana jury finding that a defendant committed a homicide with the intent to kill or inflict great bodily harm would, absent a finding of one of the aggravated circumstances, result in conviction of murder in the second, not the first, degree. In this case the trial judge instructed the jury as follows:

First degree murder is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm.... First degree murder is a capital offense meaning that if the defendant is found guilty of that offense the jury is given the authority to make a binding recommendation as to whether the sentence shall be death or life impris-

onment without benefit of probation, parole or suspension of sentence. Any such recommendation would occur in the second phase of the trial which would follow a finding of guilty of first degree murder. In this stage and at this time your only ... function is to determine the guilt or innocence of the defendant. Since two of the responsive verdicts you will be considering here are second degree murder and manslaughter, it's necessary that we define these crimes. Revised Statute 14:30.1 provides, "Second degree murder is the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of aggravated rape, aggravated arson, aggravated battery, aggravated kidnapping, aggravated escape, armed robbery or simple robbery, even though he has no intent to kill or ... the killing of a human being when the offender has a specific intent to kill under circumstances that would be first degree murder under Article 30, but the killing is accomplished without any of the aggravating circumstances listed in Article 905.4 of the Louisiana Code of Criminal Procedure....

Nowhere in the charge are the elements of article 905.4 indicated. Nor does the charge indicate that one of the aggravating circumstances must be found as an element of first degree murder. The appellant challenges the instruction for this failure to include an essential element of first degree murder and for not clearly defining second degree murder.

■ Although the jury charge was not objected to at trial and Louisiana has a contemporaneous objection rule, La.Code Crim.P. art. 841; *Tyler v. Phelps,* 643 F.2d 1095, 1100 (5th Cir. 1981), this is not fatal to the appellant's claim. The principles of comity and federalism that prevent federal courts from granting habeas relief to state prisoners whose claims are unreviewable in state courts because of failure to object, give way where there is cause for the procedural default and actual prejudice from the error. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

The appellant convincingly explains his failure to object, pointing to the judicial change in the definition of first degree murder in Louisiana through the *Payton* case. *Payton* was decided on June 30, 1978, a month prior to the appellant's trial, but was not published until after rehearing on August 18, 1978, three weeks after the trial had ended. The offense was committed April 4, 1978, during the period when the *Payton* decision was effective. *Compare with State v. Berry*, 391 So.2d 406, 409 and 412 (La.1980) (*Payton* applicable to crime committed January 30, 1978); *State v. Eaker*, 380 So.2d 19, 27 (La.), *cert. denied*, 449 U.S. 847, 101 S.Ct. 133, 66 L.Ed.2d 57 (1980) (*Payton* inapplicable because offense committed prior to effective date of statute construed by *Payton*). As the appellee admits at one point in its brief, appellant's counsel could not have anticipated this decision; appellant's failure to object at trial is thus understandable. Even if the *Payton* decision had been disseminated prior to trial, it would not have become final until action on the petition for rehearing. The criminal code provides: "If an application for a rehearing has been made timely, a judgment of the appellate court becomes final when the application is denied." La. Code Crim.P. art. 922(D) (1981). The official revision comments state that the code provisions were amended to conform to the provisions of the Code of Civil Procedure, articles 2166 and 2167, which are virtually identical. Here rehearing was granted, and the original opinion was slightly modified. Although neither code speaks to the granting of a rehearing, articles 2166 and 2167 have been interpreted as meaning that the original decree of a court of appeal never attains the status of a final judgment if it is modified or reversed on rehearing; the decree on rehearing is considered the final judgment. *Consolidation Loans, Inc. v. Guercio*, 356 So.2d 441, 442 (La.App.1977). Appellant has therefore established "cause" for purposes of *Wainwright v. Sykes. See Jiminez v. Estelle*, 557 F.2d 506, 511 (5th Cir. 1977).

■■■■ The appellant, however, fails to demonstrate any harm resulting from this irregularity in the instructions. "Before a federal court may grant relief under 28 U.S.C. § 2254 based on alleged error in a state trial court's unobjected to charge, the error must be so egregious as to rise to the level of a constitutional violation or so prejudicial as to render the trial itself fundamentally unfair." *Bryan v. Wainwright*, 588 F.2d 1108, 1110–1111 (5th Cir. 1979). The ailing instruction itself must so infect the entire trial that the resulting conviction violates due process. *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977). Although the jury in this case was not directed to make the necessary finding of aggravated circumstances in order to find the defendant guilty of first degree murder, the same jury was directed to find aggravated circumstances in the sentencing portion of the trial. The jury unanimously found two aggravating circumstances in the course of its decision to impose the death penalty: the heinous nature of the crime and its commission during the perpetration of an armed robbery. Since *Payton* prohibited consideration of the heinous nature of the offense in the guilt portion of the trial as an element of first degree murder, 361 So.2d at 871, the jury's first finding is irrelevant. The jury's second finding, however, would have been sufficient for a conviction of first degree murder under *Payton*.

Presumably, the danger the appellant points to here would be a conviction absent "proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Kibbe*, 431 U.S. at 153, 97 S.Ct. at 1736, *citing In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). Still, as this circuit has often pointed out, "actual prejudice, or its absence, must be determined by the facts and circumstances of each case." *Thomas v. Estelle*, 587 F.2d 695, 698 (5th Cir. 1979). Despite the valiant attempts of counsel, we fail to see how the fact that instructions on aggravated circumstances were given in the wrong step of a bifurcated guilt/sentencing procedure proved unfair to the defendant. In the sentencing charge, the court properly

defined armed robbery: "Armed robbery is the theft of anything of value from the person of another or which is in the immediate control of another by use of force or intimidation, while armed with a dangerous weapon." The state did not introduce any evidence of aggravating factors in the sentencing portion of the trial but relied on the evidence of armed robbery developed during the guilt/innocence phase, without indicating what that evidence was.

The victim was bludgeoned to death with objects from her own home, including a skillet, a stool, and a telephone. *State v. Baldwin*, 388 So.2d at 669. "Dangerous weapon" is defined as an "instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm." La.R.S. § 14:2(3). "The term 'dangerous weapon' is not limited to those instrumentalities which are inherently dangerous, but includes any instrumentality 'which in the manner used, is calculated or likely to produce death or great bodily harm.' " *State v. Bonier*, 367 So.2d 824, 826 (La.1979). The evidence at trial included two stool legs, part of a telephone, and pieces of a skillet, analysis of which by an expert criminologist detected blood and hair that matched the blood type and hair samples of the victim. There was also evidence that, prior to the murder, appellant had stated his intent to rob the victim and to kill her if necessary in order to take her money. The record therefore contains overwhelming evidence that the offense was committed during the perpetration of an armed robbery. This record was not added to, except in mitigation, at the time of sentencing.

The jury's combined findings in the guilt and sentencing portions of the trial permitted the imposition of the death penalty on appellant. The aggravating circumstance that led them to the imposition of this punishment existed regardless of when the jury was instructed to consider it, and it was necessarily a part of their determination of guilt. What the appellant objects to and what is really at stake here is not his conviction but his punishment. There is no

denying that when punishment was finally imposed on the defendant, at the end of his trial, the jurors had been properly instructed on everything necessary to determine their verdict and had found it all beyond a reasonable doubt.

### Jury Instructions on Sentencing

Appellant alleges error in the court's failure clearly to instruct the jury that should they be unable to reach a unanimous recommendation of either life or death, then the trial court would be obliged under the law to impose a life sentence. There is no dispute that the jury was informed that the sentence they wished to impose—whether life imprisonment or death—had to be unanimous under Louisiana law. The appellant argues that the jury was not clearly told, however, of the judge's duty to impose a life sentence should even one jury member refuse to join in a sentencing verdict. According to the appellant, this failure introduced an unacceptable level of risk that the jury might erroneously impose a death penalty. Appellant cites *State v. Williams*, 392 So.2d 619 (La.1980), where the Louisiana Supreme Court found a failure to give such an instruction to be constitutional error.

■ We disagree with the appellant's allegation of lack of clarity. The trial court told the jury at the sentencing stage:

[I]f you find beyond a reasonable doubt that any of the statutory aggravating circumstances existed, you are authorized to consider imposing a sentence of death; if you do not unanimously find beyond a reasonable doubt that any of the statutory aggravating circumstances existed, then life imprisonment without benefit of probation, parole or suspension of sentence is the only sentence that may be imposed.

Although the jury was never specifically told that if even one member of the jury held out, the trial judge would be required to impose a life sentence, we believe that

the above words to the jury made this sufficiently clear.[2]

## District-wide Proportionality Review

The Louisiana Code of Criminal Procedure requires the state supreme court to review every death sentence to see if it is an excessive penalty in the particular case. La.Code Crim.P. 905.9. In pursuit of that duty, procedures have been formulated in Rule 28 of the Rules of the Supreme Court of Louisiana that require review in each case of the other death sentences imposed in that same judicial district since 1976. The appellant argues that comparative sentence review on less than a statewide basis is not a constitutionally valid sentencing scheme. Appellant purports to derive this principle from cases like *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), and *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

The argument made is unconvincing. The appellant's brief effectively gives the argument away: "*The opinions of the Supreme Court make it clear that the lack of any express provision for proportionality review is not fatal to the validity of a death penalty statute*; however, there still must be an assurance that the death penalty is being administered in a reasonably consistent manner throughout the state for a statute to pass constitutional muster." (emphasis added). The United States Supreme Court has approved various states' systems of appellate review to insure evenhanded disposition of cases imposing the death penalty, but the Court has never put forth any one system as sacrosanct. The Constitution is concerned with the elimination of caprice, and the Louisiana approach insures "that the death penalty is being administered in a reasonably consistent manner throughout the state." The Louisiana scheme to promote evenhanded, rational, and consistent imposition of death sentences provides for a court with statewide jurisdiction to review each case where the sentence has been imposed and, in turn, satisfy itself that the sentence was not "imposed under the influence of passion, prejudice or any other arbitrary factors, whether the evidence supports the jury's finding of a statutory circumstance, and whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." La.Code Crim.P. 905.-9.1; La. Supreme Court R. 28. The court further requires the district attorney to file a list of all first degree murder cases occurring within his district having occurred since January 1, 1976, with a synopsis of its facts, the crime convicted of, and sentence imposed. La. Supreme Court R. 28 § 4. This is in addition to the court's knowledge, jurisdiction, and review of all other murder cases throughout the state. Thus, though the court's scrutiny is directed initially to those murder cases within a given judicial district, the review is not limited to such.

Furthermore, the facts of this case make it a peculiar one from which to launch an attack on the state's proportionality review procedures. Appellant was convicted of brutally beating to death an elderly woman with several blunt instruments in order to steal her possessions. It is doubtful that any conceivable method of proportionality review would show the death penalty here to be excessive or to have been arbitrarily or capriciously imposed. A justice of the Louisiana Supreme Court, who shares the appellant's sentiments on the constitutionality of the Louisiana procedures, made the same point in his concurrence in *State v. Baldwin*, 388 So.2d at 678:

> I remain of the belief that our scheme for review of the proportionality of the imposition of the death penalty is constitutionally flawed in not mandating statewide review of the sentences imposed in similar cases. *See State v. Prejean*, 379 So.2d 240, 249 (La.1980) (dissenting from denial of hearing). However, the extraordinary deliberateness and brutality of this mur-

---

**2.** We do not purport to pass on the appellant's argument that a predeliberation jury instruction on the consequences of failure to reach jury unanimity on sentencing is always re-quired, even in cases with no jury deadlock. *Compare with State v. Williams*, 392 So.2d at 634 and 640.

der of an 84-year-old woman for her valuables clearly justifies the death penalty without need of extensive comparison with other offenses.

For the above reasons, the district court's denial of relief is AFFIRMED.