Otis **ADAMS, Plaintiff-Appellant,**

v.

Charles **BALKCOM, Warden, and Arthur K. Bolton, State Attorney General, Defendants-Appellees.**

No. 81–7728.

United States Court of Appeals, Eleventh Circuit.

Oct. 8, 1982.

Thomas M. West, Atlanta, Ga., for plaintiff-appellant.

William B. Hill, Jr., Asst. Atty. Gen., Charles E. Brown, Atlanta, Ga., for defendants-appellees.

Before GOLDBERG,* HILL and HATCHETT, Circuit Judges.

HATCHETT, Circuit Judge:

This appeal requires review of the district court's denial of a petition for writ of habeas corpus, filed on behalf of a state prisoner pursuant to 28 U.S.C.A. § 2254, on the ground of denial of the constitutional right to effective assistance of counsel.

* Honorable Irving L. Goldberg, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

## FACTS

On November 22, 1974, Otis Adams, the appellant, arrived at the apartment where he lived with Rosie Mae Stewart. Finding Stewart in her bedroom, Adams accused her of being drunk and a heated argument started. After Stewart told him to get out, Adams began gathering his clothes. As the couple stood arguing in a hallway of the apartment, Stewart allegedly came towards Adams with her hands behind her back. Adams testified that she suddenly "charged [him] all at once and struck [him] up beside the head with [a] hammer." As a result of the blow, Adams claims he went into a "semi-conscious" condition and momentarily blacked out. Adams testified that as he took his hands out of his pockets to prevent falling and to get Stewart off of him, he accidently shot her with a small .22 caliber pistol he had in his pocket. Although defense counsel contended that the killing was in self-defense or an accident, Adams insisted on cross-examination that the killing was accidental.

According to the state's version of the incident, Adams intentionally murdered Rosie Mae Stewart. Through the testimony of the victim's daughter, Arie Mae Whitehead, the state attempted to establish that Adams deliberately drew his gun and shot the victim, without provocation. Arie Mae Whitehead lived in her mother's apartment and witnessed the argument and killing. At trial, Arie Mae Whitehead testified that her mother did not hit Adams with a hammer and did not have a hammer on the premises. She also testified that her mother was not struggling or fighting, but that the couple was "cussing and going on and [Adams] reached his hand in his pocket and pulled a pistol out and pressed it up against her ear and pulled the trigger and she fell." Rosie Mae Stewart died of a gunshot wound to her head.

Atlanta police found the victim sprawled on the floor with her legs entwined by a telephone cord which had been ripped from the wall. Pieces of a broken light bulb were strewn about her bedroom floor.

At the habeas corpus hearing before the district court, trial counsel agreed that the defense theory was that:

> [Adams] did shoot the victim but that either through accident or mistake his hand came out of his pocket where he had a pistol, his hand was thrown up some how in a manner that he did not remember exactly—what exactly happened, threw the pistol up, some how it discharged and she was killed only after the victim had attacked him, in fact, hit him in the head with a hammer.

To establish its defense, defense counsel had to show that blood found in the hallway and on the steps from the victim's apartment was from Adams's head wound which the victim had inflicted with the hammer prior to the shooting. It was also necessary for Adams's attorney to discredit the testimony of the sole eyewitness to the crime—the victim's daughter.

Despite the daughter's testimony that no hammer was on the premises, and Adams was not hit by the victim, extensive evidence corroborated Adams's assertion that he was struck with a hammer before he shot the victim. Police found a hammer lying within inches of the victim's body. A police officer testified that he noticed drops of blood on the steps leading from the apartment. The magistrate to whom the petition for habeas corpus was referred found that this blood could not have come from the victim. Moreover, a neighbor who looked out the window after hearing the shot testified that she saw Adams descending the steps "rather slowly with his head down like he was either injured or sad." Another neighbor who saw blood on the stairway testified that she heard Adams state that he was going to the hospital. One of the officers who arrested appellant at the hospital stated that Adams had sustained a head wound. Finally, medical records in evidence showed that Adams had received treatment for a head injury.

## I. BACKGROUND

After a jury found Adams guilty of the murder of Rosie Mae Stewart, the Superior

Court of Fulton County, Georgia, sentenced Adams to life imprisonment. After the trial court overruled his amended motion for a new trial, the Georgia Supreme Court affirmed Adams's conviction and sentence. *Adams v. State,* 236 Ga. 468, 224 S.E.2d 32 (1976). He then filed a petition for writ of habeas corpus in the Superior Court of Tattnall County. After an evidentiary hearing, the court denied relief.

After exhausting state remedies, in January, 1980, Adams filed this habeas corpus proceeding in the district court pursuant to 28 U.S.C.A. § 2254, contending that his conviction violated his sixth and fourteenth amendment right to effective assistance of counsel. The United States Magistrate found that the state habeas corpus hearing was neither full nor fair because the record did not disclose that Adams had the opportunity to cross-examine the state's witnesses. After an evidentiary hearing with court appointed counsel, the magistrate recommended denial of the petition. On July 27, 1981, the district court entered judgment against Adams. This appeal followed.

Adams contends that he was deprived of his constitutional right to effective representation at his trial because his attorney:

(1) Failed to submit the blood found on the stairs and in the apartment for analysis to determine that it was his;

(2) failed to seek an independent lab analysis of the hammer to ascertain the presence of blood, hair, or fingerprints;

(3) failed to adequately establish the fact that Adams had sustained a head wound and the nature and extent of the injury;

(4) failed to effectively impeach Arie Mae Whitehead, the state's strongest witness;

(5) elicited extremely damaging testimony on cross-examination; and

(6) bolstered the credibility of the state's primary witness during closing argument.

## II. EFFECTIVE ASSISTANCE OF COUNSEL

### A. *Standard of Review*

The sixth amendment guarantees a criminal defendant the right to effective,

not errorless, counsel. *Young v. Zant,* 677 F.2d 792, 798 (11th Cir. 1982); *Mylar v. Alabama,* 671 F.2d 1299, 1300 (11th Cir. 1982). Under the standard for reviewing claims of ineffective assistance of counsel, this court does not judge counsel's representation solely by the benefit of hindsight. *Washington v. Watkins,* 655 F.2d 1346, 1355 (5th Cir. 1981); *Lovett v. Florida,* 627 F.2d 706, 708 (5th Cir. 1980). Rather, we must determine whether counsel was reasonably likely to render, and rendered reasonably effective assistance. *Herring v. Estelle,* 491 F.2d 125, 127 (5th Cir. 1974) (quoting *MacKenna v. Ellis,* 280 F.2d 592, 599 (5th Cir. 1960)), *adhered to in pertinent part on rehearing en banc,* 289 F.2d 928 (5th Cir.), *cert. denied,* 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961). The application of this standard requires an inquiry into the actual performance of defense counsel and a determination whether representation was reasonably effective based on the totality of the circumstances in the entire record. *Washington v. Watkins,* 655 F.2d at 1355; *Baldwin v. Blackburn,* 653 F.2d 942, 946 (5th Cir. 1981).

"Informed evaluation of potential defenses to criminal charges and meaningful discussion with one's client of the realities of his case are cornerstones of effective assistance of counsel." *Gaines v. Hopper,* 575 F.2d 1147, 1149–50 (5th Cir. 1978). Tactical decisions, however, do not render assistance ineffective merely because in retrospect it is apparent that counsel chose the wrong course. *Baldwin v. Blackburn,* 653 F.2d at 946; *Beckham v. Wainwright,* 639 F.2d 262, 265 (5th Cir. 1981). Certain defense strategies, however, may be "so ill chosen" as to render counsel's overall representation constitutionally defective. *Washington v. Watkins,* 655 F.2d at 1364.

The defendant bears the burden of proving that he did not have effective assistance of counsel. *United States v. Phillips,* 664 F.2d 971, 1040 (5th Cir. 1981). If counsel's assistance is deemed unconstitu-

tionally inadequate, the habeas corpus petitioner must then demonstrate that he was "prejudiced" to "some" degree.[1] *Beavers v. Balkcom,* 636 F.2d 114, 116 (5th Cir. 1981). "Prejudice" does not embrace errors which are merely detrimental to appellant's case. 655 F.2d at 1360. Rather, where the defendant does not complain of errors of constitutional dimension, the requisite prejudice must be of such magnitude as to render the trial as a whole "fundamentally unfair." *Nelson v. Estelle,* 642 F.2d at 903, 907–08 (5th Cir. 1981); *Hills v. Henderson,* 529 F.2d 397, 401 & n. 8 (5th Cir.), *cert. denied sub nom. Hills v. Maggio,* 429 U.S. 850, 97 S.Ct. 139, 50 L.Ed.2d 124 (1976).[2]

Whether counsel has rendered effective assistance is a mixed question of law and fact which requires the appellate court to independently apply legal principles to the district court's findings of basic, historical facts of the case. *Young v. Zant,* 677 F.2d 792, 798. Thus, while we must defer to the district court's findings as to what counsel did or did not do, absent a clearly erroneous determination, we independently evaluate whether counsel's representation satisfied the standards of the sixth and fourteenth amendments.

### B. The Assistance Rendered

Pre-trial " 'investigation and preparation are the keys to effective representa-

tion.' " *Rummel v. Estelle,* 590 F.2d 103, 104 (5th Cir. 1979) (quoting *ABA Projects on Standards for Criminal Justice,* Standards Relating to the Prosecution Function and the Defense Function, 224 (App. Draft 1971)). Specifically, "[a]n attorney does not provide effective assistance if he fails to investigate sources of evidence which may be helpful to the defense.". *Davis v. Alabama,* 596 F.2d 1214, 1217 (5th Cir. 1979), *vacated as moot,* 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980). Thus, the failure to pursue scientific evidence in support of a defense claim may be tantamount to ineffective assistance. *See Davis v. Alabama,* 596 F.2d at 1217–18 (finding ineffective assistance where counsel failed to investigate evidence which might be helpful to insanity defense despite knowledge of accused's mental history and that insanity was the only possible defense); *United States v. Fessel,* 531 F.2d 1275, 1279 (5th Cir. 1976) (representation inadequate where failure to move for court-appointed psychiatrist deprived accused of services "necessary to the preparation and presentation of an adequate defense"). Similarly, the failure to impeach a key government witness may also constitute ineffective assistance. *United States v. Auten,* 632 F.2d 478, 482 (5th Cir. 1980); *Voyles v. Watkins,* 489 F.Supp. 901, 911 (N.D.Miss.1980). We have also held that where the inadequacy of counsel's

---

1. Certain classes of ineffective assistance claims do not require the accused to demonstrate prejudice. These include claims that no counsel was appointed. *E.g., Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). A second such category includes cases where counsel was appointed but was prevented by a "systemic defect" from rendering services vital to effective representation. *See Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (defense counsel not permitted to confer with client during overnight mid-trial recess); *Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) (state statute barred final summation by defense counsel). Third, the defendant need not show prejudice where counsel's representation of multiple defendants created a conflict of interest. *E.g., Cuyler v. Sullivan,* 446 U.S. 335, 348–50, 100 S.Ct. 1708, 1718–1719, 64 L.Ed.2d 333 (1980). Fourth, the same result exists where counsel's representation was not merely deficient or inadequate in many or most

respects, but was functionally equivalent in every respect to having no representation at all. *E.g., Davis v. Alabama,* 596 F.2d 1214, 1221–22 (5th Cir. 1979), *vacated as moot,* 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980).

2. Where counsel's ineffectiveness implicated errors of constitutional proportions, some courts have applied a more stringent standard in assessing prejudice. These courts have invoked the harmless error principle in determining whether the demonstrated prejudice warrants federal habeas corpus relief. *See United States v. Decoster,* 624 F.2d 196, 208 & n. 74 (D.C. Cir. 1979) (en banc) (plurality opinion of Leventhal, J.), 624 F.2d at 290–95 (Bazalon, J., dissenting); *Davis v. Alabama,* 596 F.2d 1214, 1221–23 (5th Cir. 1979), vacated as moot, 446 U.S. 903, 100 S.Ct. 1827, 64 L.Ed.2d 256 (1980). See generally *Hills v. Henderson,* 529 F.2d at 401–02, n. 8.

preparation results in his failure to understand basic procedural requirements, counsel's services fall outside the range of competency expected of criminal defense attorneys. *Young v. Zant,* 677 F.2d at 798, *see Kemp v. Leggett,* 635 F.2d 453, 454 (5th Cir. 1981).

■ On the other hand, the duty to adequately investigate and prepare is not without limits. Each case must be judged on its specific facts, from the perspective of counsel, considering those circumstances known to him at the time in question. *Rummel v. Estelle,* 590 F.2d at 105. "[C]ounsel for a criminal defendant is not required to pursue every path until it bears fruit or until all conceivable hope withers." *Lovett v. Florida,* 627 F.2d at 708.

### 1. *Scientific Evidence*

■ The trial court found that although counsel neglected to obtain a chemi-

cal analysis of the blood found on the steps, the evidence as a whole established that the blood had come from Adams and not the victim. Thus, no issue was presented to the jury as to the source of the blood.[3] This finding is not clearly erroneous. Under all the circumstances, counsel's failure to test the blood was a reasoned tactical choice because no evidence pointed to the blood as being that of the victim.

With respect to the hammer, the Georgia State Crime Lab examined the hammer for blood and hair with negative results. Defense counsel testified at the federal habeas corpus hearing that he wanted independent lab tests conducted for fingerprints. Yet, he neglected to file a motion for an independent lab analysis and did not get the hammer from the state crime lab.[4] Defense counsel indicated that he abandoned that line of investigation upon learning of the state lab results. Defense counsel trusted

---

**3.** In connection with the contention that trial counsel was ineffective for failing to obtain a chemical analysis of the blood in order to identify it as Adams's, defense counsel testified at the federal habeas corpus hearing that:

> I thought it was necessary to make some determination as to what that meant about the blood being on the steps but I believe I dismissed that in my mind when, you know, in view of what was happening. Nobody was saying anything about the victim had been shot somewhere else and brought upstairs. Nobody else had any wounds. I just couldn't relate that to anything so I dismissed that out of my mind being relative to it.

**4.** On direct examination by Adams's habeas corpus counsel, his trial counsel revealed the difficulties he encountered in obtaining evidence in connection with the hammer:

> Q. Did you consider having the hammer examined by an expert other than the State Crime Lab?
> A. Yes, I did consider that.
> Q. What was the result of that?
> A. I can't tell you what the results of that was. I kept, I recall, very, very much I recall very often wanting to get the hammer, wanting the hammer and asking about the hammer and having somebody telling me it's still in the crime lab.
> Q. You were just never able to get the hammer to have it examined?
> A. No, sir.
> THE COURT: Did you file a motion for an independent lab analysis on that?

> A. No, sir, I didn't do that. I just didn't do that.
> Q. Did you consider having the hammer checked for fingerprints?
> A. Yes, I considered that. That was the reason I wanted the hammer so bad. I never could get my hands on the hammer. I think at some point I found that all of that had been done by the District Attorney.
> Q. It had been done by the State already?
> A. Yes. So I just took what the results of that was.

Although the evidence introduced at trial supported the defense's position that Adams suffered a head wound at the time of the shooting, defense counsel testified at the district court habeas corpus hearing:

> I could never get what I wanted to get in with the hammer. I couldn't get that in properly....
>
> ....
>
> I could not get a report from the—there was no report that the hammer had been analyzed. There was no report that there was any blood on the hammer.
>
> ....
>
> I was not able to prove that he had been hit by the hammer because there was no blood ... on the hammer.... I didn't find in the hammer what I wanted to. But I had talked to some people and my understanding was that notwithstanding the fact that there was no blood on the hammer it was still possible for him to get hit with the hammer.

their work.[5] The district court declined to fault defense counsel's failure to obtain an independent chemical analysis of the hammer and his reliance on the state lab results because no evidence warranted an inference that the results were unreliable. The court also found harmless defense counsel's failure to seek expert analysis for fingerprints because of the likelihood that the victim's fingerprints would appear on a hammer found in her home.

We agree with the district court's conclusion that expert testimony on this matter would have added little, if any, support to the defense's case. A police officer testified to having discovered the hammer lying astride the victim's body. The district court pointed out that no evidence existed to indicate that anyone had placed the hammer there after the shooting. Thus, evidence of an analysis of the hammer would have been, at best, cumulative, or perhaps, harmful to Adams.

The record indicates that trial counsel's efforts were also wanting with respect to his ability to establish that his client received treatment for a head wound. Defense counsel neither interviewed nor called as witnesses the medical personnel at the hospital or the officer who arrested Adams at the hospital. Additionally, counsel demonstrated his ignorance of evidentiary procedure in his attempts to introduce a copy of Adams's medical records and head x-rays through the testimony of a police officer. Counsel eventually succeeded in introducing the records, but only through the benevolence of the prosecutor who explained in closing argument to the jury the reasons for the inadmissibility of this evidence and the proper method for introducing such proof. Despite counsel's deficiencies, the testimony of Adams, the police officer, and the victim's neighbors adequately established that Adams suffered a blow to his head and received treatment for his wounds at the hospital. The medical records documenting his treatment were, in fact, eventually introduced. We therefore conclude that Adams suffered no prejudice from his counsel's failure to call the medical personnel who treated appellant since such evidence would have been cumulative.

### 2. Impeachment Efforts

The evidence at trial presented a question as to whether and to what extent Arie Mae Whitehead observed the murder of her mother. Adams testified that, as the couple argued in the victim's bedroom, Arie Mae looked on from the hallway immediately outside the bedroom. According to Adams, after the victim ordered him to get out, Arie Mae began gathering his clothes from her mother's closet. Adams further stated that at the time of the shooting Arie Mae was standing behind and off to the side of her mother. Arie Mae testified that she saw the shooting, but did not see her mother holding a hammer. In what seemed an effort to impeach the reliability of her observations, defense counsel attempted to emphasize her uncertainty through cross-examination.[6]

Defense counsel also tried to impeach Arie Mae by utilizing her statements which appeared in a police report and in a copy of the preliminary hearing transcript. Counsel testified at the federal habeas corpus hearing that he wanted to underscore the

---

5. Specifically, trial counsel stated, "I decided the crime lab organization of the State wouldn't try to trick Mr. Adams. I think I decided something like that. I just went along with them because they had tested the blood."

6. The colloquy on cross-examination between defense counsel and Arie Mae regarding the hammer was as follows:

Q. Now, you say that when Mr. Adams confronted your mother in the hall you were not certain whether she had a hammer. Is that what you said?

A. I didn't see no hammer.
Q. You didn't see a hammer?
A. That's right.
Q. I think your testimony was that I couldn't tell whether she had a hammer.
A. Well, I couldn't tell, but I didn't see none.
Q. But you don't know whether she had a hammer or not?
A. No, I don't.

alleged inconsistencies between these prior statements and her trial testimony to show that she was biased against Adams and, because of that prejudice, lied both at trial and earlier to the police.[7] Defense counsel's cross-examination of Arie Mae at trial and his testimony at the federal habeas corpus hearing indicate that in her statement to the police she *may* have said that she was in her bedroom when she heard the shot.[8]

7. Defense counsel indicated that his strategy was to use Arie Mae's prior inconsistent statements to police and at the preliminary hearing to impeach her credibility at trial. On direct-examination by Adams's appellate counsel, trial counsel testified at the federal habeas corpus hearing as follows:

Q. Now to refresh your memory about what Arie Whitehead testified to, during the trial you questioned her about the statement that she had made to the police and in that statement you alleged that she had said that she had gone to the bedroom prior to the shooting. Does that refresh your memory?
A. Yes, sir, I remember something like that.
Q. And at trial she testified that she was in the kitchen; is that correct?
A. That's correct.
Q. So the conflict was there was a conflict between what she said at trial and what she said at the preliminary hearing and the statements she made to the police?
A. Yes, sir.
Q. Do you remember that that conflict was that previously she had said that she was in the bedroom and at trial she said that she was in the kitchen?
A. Right, there was a discrepancy in that.
Q. And I take it that, well, you tell me was that one of the defense theories that she was not able to see it because she was in the bedroom?
A. My intent was to show that she was prejudiced. She was a prejudiced witness because that was her mother and they were not, Mr. Adams and her mother were not married so she had no kinship with him other than a proposed common law-step daughter or something. But I wanted to show she was prejudiced in favor of her mother. I quite honestly believe she was prejudiced.
Q. And in fact, because of that prejudice she lied at trial?
A. Yes, she did.
Q. Do you think the testimony she gave at the preliminary hearing was the truth?
A. No, sir, that was a lie.
Q. Do you think the statement she made to the police contained the truth?
A. No, sir, I don't think that contained the truth either.

Contrary to Adams's assertions on appeal, at the preliminary hearing, Arie Mae testified that she was present at the scene and observed the shooting.[9] Arie Mae further testified at trial that she was standing between the kitchen and the front room at the time of the shooting and "saw everything."

In what seemingly was an effort to lay a predicate for impeachment, defense counsel posed certain questions to Arie Mae at trial

Q. But there were inconsistencies between transcripts, the hearing or the statement and what she testified to at trial?
A. Yes, sir.
Q. Do you from reading the police statement where it indicated that she was in the bedroom or had gone to the bedroom and then at trial she testified that she was in the kitchen, did you make any effort to show that inconsistency?
A. I believe I did. . . .
Q. That certainly would be a possible defense tactic, wouldn't it be to show an inconsistency in the State's witness and you intended to show that inconsistency?
A. Right.

8. The exact whereabouts of Arie Mae Whitehead at the time of the shooting remains uncertain because Adams has neglected to introduce the police statement into the record both at trial and on appeal.

9. Defense counsel apparently was mistaken in his belief that Arie Mae's testimony at the preliminary hearing was inconsistent with her stance at trial. In fact, her testimony at the probable cause hearing comported with her assertion at trial that she was present at the shooting. On this matter, the following colloquy ensued at the preliminary hearing before the Atlanta Municipal Court:

DEFENSE COUNSEL: Your Honor, . . . the deceased's daughter, Ms. Whitehead, made the statement to the police officer that she was not present she did not see—
THE COURT: I read the statement. You're talking about this statement that I read?
DEFENSE COUNSEL: Yes, that she came out of the room.
THE COURT: I already read this statement.
DEFENSE COUNSEL: Now she says she was there.
MS. WHITEHEAD: I was there.
THE COURT: Just a minute.
DEFENSE COUNSEL: It's completely inconsistent, Your Honor. I can appreciate why she would take that position. I can appreciate that; I'm sure the Court can. That was her mother.

and marked her statement to police as a defense exhibit. He apparently forgot to offer the statement and failed to lay a proper foundation for its introduction into evidence. As part of his case, defense counsel also identified as an exhibit for the record a certified copy of the transcript of the preliminary hearing. The trial court ruled, however, that the transcript was inadmissible under all circumstances.[10]

After conducting an evidentiary hearing, the district court refrained from predicating a finding of ineffective assistance on defense counsel's failure to impeach the credibility of Arie Mae Whitehead. The court implicitly concluded that Adams suffered no prejudice as a result of counsel's shortcomings. The court reasoned that Adams failed to carry his burden of proof by showing that the exhibit would in fact have impeached Arie Mae's trial testimony if admitted into evidence.

▇ We agree for several reasons. First, the record remains uncertain as to the exact details of Arie Mae's statement to police. Adams failed to offer this document into evidence at trial and has made no effort to introduce the statement into the record on appeal. We thus are unable to determine whether this evidence would have effectively impeached the witness.

Second, an examination of the preliminary hearing transcript indicates that Arie Mae's testimony was consistent with her statements at trial. In fact, at one point during the federal habeas corpus hearing, defense counsel stated that the substance of Arie Mae's testimony at the preliminary hearing and at trial was the same. Counsel later mistakenly asserted that Arie Mae testified at the preliminary hearing that she was in the bedroom at the time of the killing, in contrast to her testimony at trial that she was an eyewitness. Because we find no inconsistencies between her assertions at trial and at the preliminary hearing, we believe the jury would not have viewed her testimony as inconsistent.

Finally, because Adams's testimony corroborated that of Arie Mae by stating that she was in a position to observe the facts which she related, any weight which the jury would have attributed to any prior inconsistent statement would have been negligible. Thus, we conclude that Adams has not demonstrated any prejudice resulting from defense counsel's impeachment efforts which would render his trial fundamentally unfair.

### 3. Damaging Statement

The next allegation causes us great concern. Adams claims that his trial counsel's ineffectiveness is underscored by his elicitation of damaging testimony from Arie Mae. In an effort to impeach her on recross-examination, counsel asked Arie Mae if she remembered testifying at the preliminary hearing that Adams had yelled just prior to shooting her mother, " 'Yes hell, I will, I will kill her, I will blow your brains out,' and he shot her in the head and she fell." [11]

---

10. The trial court refused to admit defense counsel's exhibit of a certified copy of the transcript of the preliminary hearing. The court reasoned that such evidence was "accumulative" and under all circumstances ... not ... admissible."

11. On cross-examination, defense counsel elicited the following testimony from Arie Mae:

Q. Miss Whitehead, do you remember testifying at the City of Atlanta Municipal Court?
. . . .
A. Yes.
Q. Do you remember when you said that "So I went toward the kitchen and came back and I begged him not to kill her and he started cussing and he said, 'Yes, hell, I will, I will kill her, I will blow your brains out,' and he shot her in the head and she fell"?
A. Shot her in the ear.
Q. That is what you said, "shot her in the head and she fell." Do you remember saying that?
A. Well, I was a little upset and I probably did.
Q. So you don't remember saying that?
A. I told the guy I was upset and everything.
Q. Do you remember him saying, "Yes, hell yes, I'll kill you, I'll kill you."
A. Yes, he said that.
Q. Did he say that?
A. He said he would kill her.
Q. Is that the way he said it?
. . . .
A. Yeah, and he stuck the gun to her ear.

At the habeas corpus hearing in district court, defense counsel explained his reasons for asking the question as an attempt to show an inconsistency in Arie Mae's testimony on direct examination at trial. Arie Mae testified at the preliminary hearing that Adams had made statements before the shooting, but at trial, Arie Mae testified that Adams said nothing at the time of the shooting.

The record indicates, however, that Arie Mae did not in fact testify on direct-examination that Adams said nothing at the time of the shooting. She stated only that she did not recall anything specific that either Adams or the victim had said except that the couple had been "cussing." Similarly, on cross-examination, she did not state that Adams said nothing but only that "they was cussing and all." Nevertheless, Arie Mae did not deny having made the alleged inconsistent statement. Instead, she told defense counsel that she refrained from making the damaging statement at trial because she does not swear.

Adams argues that the benefit, if any, of showing this purported slight inconsistency in Arie Mae's testimony was far outweighed by the damaging impact of her statement. Indeed, even the defense counsel characterized this testimony as the most damaging evidence against Adams. Nevertheless, he believed that impeachment on this point was important to show that Arie Mae recognized the discrepancy in her testimony and that she was making excuses to cover up her motives for so doing.[12] Thus, the district court found that defense counsel made a reasoned, tactical choice to bring out the statement.

The state argues on appeal that tactical decisions do not constitute ineffective as-

sistance merely because in hindsight it is apparent that counsel chose the wrong course. *Baldwin v. Blackburn,* 653 F.2d at 946; *Beckham v. Wainwright,* 639 F.2d at 265. This court has held that counsel's decision whether to question witnesses is a defense strategy and does not reach constitutional proportions. *United States v. Hughes,* 635 F.2d 449, 452 (5th Cir. 1981); *United States v. Johnson,* 615 F.2d 1125, 1127 (5th Cir. 1980); *Easter v. Estelle,* 609 F.2d 756, 759 (5th Cir. 1980).

We believe that counsel's trial strategy in eliciting the damaging statement was utterly devoid of common sense, especially in view of the fact that the prosecutor neglected to bring this inflammatory statement on direct-examination. Since counsel's question was totally inconsistent with his defense theory that the shooting was an accident or self-defense, this strategy undermined the merits of Adams's defense. Moreover, as noted above, an examination of the record indicates that counsel's assumption that Arie Mae's testimony concerning whether Adams said anything immediately prior to shooting her mother was probably erroneous. *Cf. Cooks v. United States,* 461 F.2d 530, 532 (5th Cir. 1972) (although counsel's good faith errors are usually insufficient to justify vacating sentence, counsel's significant misleading statements can rise to due process denial commensurate with ineffective assistance).

"Sometimes a single error is so substantial that it alone caused the attorney's assistance to fall below the Sixth Amendment standard." *Nero v. Blackburn,* 597 F.2d 991, 994 (5th Cir. 1979). Nevertheless, this court has held counsel to be ineffective on the basis of a single error where the error in and of itself reached constitutional pro-

Q. What did he say?
A. The same thing you said.
Q. Previously you said he said nothing.
A. Say what?
Q. Before, formerly you said—
A. See, l don't like to cuss and all that, you know, they teach us not to cuss.
Q. So that is the reason you didn't say that before?
A. I don't do no cussing like that.

12. Counsel testified at the federal habeas corpus hearing:

Yes, I recall she was trying to make an excuse for having the discrepancy in her testimony. What she was saying was that, "I was just sick that day" or "something was wrong with me," but she recognized the fact that she had made a discrepancy. I thought that was pointed out to the Court.

portions and could have served as an alternative ground for the court's holding. *Nelson v. Estelle,* 642 F.2d at 906–07; *see, e.g. Nero v. Blackburn,* 597 F.2d 991 (5th Cir. 1979) (admission of three extraneous offenses by prosecution in closing would have been prejudicial enough to violate "fundamental fairness"); *Herring v. Estelle,* 491 F.2d 125 (5th Cir. 1974) (counsel allowed client knowingly and involuntarily to plead guilty to armed robbery charge where requisite element of intent permanently to deprive would have been impossible to prove by the state); *Cooks v. United States,* 461 F.2d 530 (5th Cir. 1972) (counsel's misinforming his client concerning maximum possible sentence was ineffective assistance as well as violation of due process right to enter a plea knowingly and voluntarily). This appeal does not present such a case.

■ Even assuming that counsel's decision to elicit the damaging statement was a tactical choice, the circumstances of this case cause us to conclude that such strategy was not "so ill chosen" as to render appellant's trial as a whole "fundamentally unfair." *Nelson v. Estelle,* 642 F.2d at 942. As an example of the magnitude of prejudice required to establish "fundamental unfairness," the former Fifth Circuit has held that the erroneous admission of prejudicial evidence can justify habeas corpus relief only if the error was "material in the sense of a crucial, critical, highly significant factor." *Nelson v. Estelle,* 642 F.2d at 907–08 (quoting *Hills v. Henderson,* 529 F.2d at 401), *cert. denied,* 429 U.S. 850, 97 S.Ct. 139, 50 L.Ed.2d 124 (1976); *accord Mendiola v. Estelle,* 635 F.2d 487, 491 (5th Cir. 1981). The elicitation of the statement was "prejudicial" only in the sense that it did not help Adams's case.

■ Significantly, Adams failed to show that the damaging statement was inadmissible, inaccurate, or otherwise unreliable. Apart from this inflammatory testimony, Arie Mae testified that Adams put the pistol to her mother's head and fired. Adams himself corroborated her testimony that she was in fact an eyewitness. Even assuming that this evidence was inadmissi-

ble and regardless of whether the jurors were in fact influenced by the damaging statement, the record reflects that the state's case was so strong that we cannot conclude that counsel's conduct was so deficient as to render the trial fundamentally unfair. *See Nelson v. Estelle,* 642 F.2d at 908 (counsel's failure to preserve reversible error by objecting to hearsay nature of lab reports admitted into evidence not "prejudicial" enough to render trial fundamentally unfair in view of overwhelming evidence of guilt); *Hills v. Henderson,* 529 F.2d at 401 (improper admission of prior act evidence did not deny due process in view of strength of state's case). We therefore conclude that Adams failed to sustain his burden of proving "prejudice."

### 4. *Improper Bolster*

Finally, Adams contends that defense counsel prejudiced his case in closing argument by strengthening the credibility of the state's strongest witness. In arguing Arie Mae's testimony to the jury, defense counsel made the following comments:

> The district attorney would have us believe that she was an idiot, or at least retarded, and that is his own witness. He would have us to believe that she could not perceive on that night what actually happened.
>
> . . . .
>
> Now, do you recall the testimony of Mrs. Mylessia Black. Mrs. Black was a lady who lived across the hall. The district attorney asked her if she thought that Mrs. Whitehead was retarded or mentally ill. Her response was no, I don't think so. Her response was no. As a matter of fact, she was my companion. There has been no testimony by any experts or anyone in my judgment that would indicate that this girl was retarded or mentally ill. She was strange, I can see that. Her actions on the witness stand were weird. But there are a lot of us who act weird. Doesn't necessarily mean that we are retarded.
>
> It was no evidence that she could not observe, recall and narrate. There was

no evidence of that. There was no evidence whatsoever that she could not observe, did not observe what took place that night and could not narrate that. Hostile. I think she was hostile. I would be. You would be. I think any average man, any reasonable person would be. If someone killed my mother, shot my mother, I would be hostile. I would feel like that person needed to be punished, whether he was right or wrong. I think this is the way she felt.

██ Throughout the trial, the prosecutor attempted to provide an excuse for Arie Mae's unfavorable demeanor on the witness stand by eliciting testimony attacking her mental capacity.[13] Thus, the district court found defense counsel's closing argument a reasonable tactical approach to combat the prosecutor's efforts. We agree. The record indicates that defense counsel's closing argument attempted to convey his belief that Arie Mae's demeanor was not justifiable because of any mental or perceptive handicap but was due to her hostility towards the accused. We are mindful of the fact that Arie Mae was the key witness in this case. We thus conclude that counsel's closing argument did not comprise ineffective assistance.

Apart from the errors complained of, the district court found that defense counsel's representation and preparation for trial was not otherwise deficient. He obtained a pretrial release on bond for Adams. At least six conferences with Adams were held during which they discussed potential defenses. Counsel plea bargained with the prosecutor and obtained an offer of eight years for a lesser included offense. Adams adamantly refused to plead to the offense or a lesser included offense and requested a trial on the merits of the murder charge. Counsel or his investigator went to the scene of the crime, interviewed neighbors and police, and attempted to locate character witnesses. Finally, Adams's counsel spoke with the district attorney and reviewed the state's file.

---

**13.** The prosecutor attempted to justify Arie Mae Whitehead's inability to narrate well by eliciting testimony from a neighbor that she was not mentally retarded, but "slightly mentally ill," "confused," "different," and "irrational."

## CONCLUSION

Judging trial counsel's performance on the record as a whole, we hold that he rendered effective assistance in the totality of the circumstances and, accordingly, affirm the denial of the writ of habeas corpus.

**AFFIRMED.**