# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 11, 2010

No. 08-70034

Lyle W. Cayce
Clerk

RICHARD VASQUEZ

Petitioner-Appellant

v.

RICK THALER, Director, Texas Department of Criminal Justice,
Correctional Institutions Division

Respondent-Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:05-CV-59

Before WIENER, STEWART, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Petitioner Richard Vasquez appeals from the district court's denial of his petition for habeas corpus relief under 28 U.S.C. §§ 2253 & 2254. The district court did, however, issue a certificate of appealibility ("COA") *sua sponte* on the two issues now before us: (1) whether Vasquez received ineffective assistance of trial counsel when his attorneys failed to investigate and present significant mitigating evidence during the penalty phase of his trial; and (2) whether

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 08-70034

Vasquez received ineffective assistance of appellate counsel because his attorney labored under an actual conflict of interest arising from the attorney's undisclosed, simultaneous service as a special prosecutor in multiple death penalty cases in the same jurisdiction.   Although troubled by the performance of Vasquez's trial counsel and by the divided loyalties of Vasquez's appellate counsel, the demanding standard of review imposed by the Anti-Terrorism and Effective Death Penalty Act[1] ("AEDPA") ties our hands.  We affirm.

## I.  Facts & Proceedings

The Texas Court of Criminal Appeals summarized the facts adduced at trial when it affirmed Vasquez's conviction on direct appeal.[2]  We recount here only those facts that bear on Vasquez's two claims of ineffective assistance of counsel ("IAC").

In 1999, a Texas jury convicted eighteen-year-old Richard Vasquez of the brutal beating death of Miranda Lopez,[3] the four-year-old daughter of Vasquez's girlfriend, Brenda Lopez, from a prior relationship. Vasquez and Lopez also had a four-month-old daughter, Meagan, and the four of them had lived together with Vasquez's adoptive parents, who were his paternal aunt and uncle.

During the guilt/innocence phase of the trial, it emerged that Vasquez had been addicted to cocaine and heroin from the age of twelve or thirteen; that

---

[1] 28 U.S.C. § 2254(d)(1)-(2).
(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

[2] *Vasquez v. State*, No. 73,461 (Tex. Crim. App. Oct. 3, 2001) (unpublished).

[3] TEX. PENAL CODE ANN. § 19.03 (a)(8).

No. 08-70034

his girlfriend, Brenda, was similarly addicted; and that at the time of the murder in March 1998, Vasquez and Brenda were on a prolonged heroin binge in which "'they stopped caring about themselves, the children, or anything else except drugs. They would leave the children anywhere so that they could go out and steal things in order to buy more drugs.'"[4] Throughout the night before the murder, Vasquez and Brenda had argued, and they injected themselves with heroin some time in the early morning hours before falling asleep. When he awoke, Vasquez injected himself with more heroin before driving Brenda to work at around noon, taking the two children with him in the car. On the way, Vasquez became angry with Brenda because he had to stay home and watch the children while she worked. No one was home when he returned, and he telephoned Brenda to ask her where she had hidden the remainder of their drugs. When she refused to tell him, Vasquez became angry and unleashed his frustration on Miranda. She died as a result of severe brain injuries sustained when Vasquez, in a drug-fueled rage, struck her several times in the head. At trial, significant evidence emerged that Miranda had also been severely sexually assaulted before she died, responsibility for which Vasquez denied.[5] A toxicology report revealed cocaine levels in Miranda's blood that were double the lethal amount for an adult, although neither the doctor nor Vasquez could explain the presence of the drug in her blood.

Vasquez was represented by three attorneys at trial. As part of his defense, Vasquez's trial attorneys offered the testimony of a psychiatrist, Dr. Carlos Estrada, who informed the jury that Vasquez had been addicted to

---

[4] *Vasquez v. State*, No. 73,461 (Tex. Crim. App. Oct. 3, 2001) (unpublished).

[5] Vasquez's state and federal petitions also included an additional ineffective assistance of counsel claim premised on trial counsel's failure adequately to rebut the state's evidence that he sexually assaulted Miranda Lopez. The district court denied this claim and did not grant a certificate of appealability with respect to it. Consequently, we do not consider it here.

narcotics from the age of twelve and that his behavior was typical of addicts. Dr. Estrada also testified that, if rehabilitated, Vasquez would not be a danger to society. It later emerged, however, that Estrada had told Vasquez's attorneys that Vasquez's medical records and school record were incomplete and that Vasquez appeared to warrant additional neurological testing. Vasquez's attorneys never requisitioned these additional tests, and no further psychological or neurological evidence was presented to the jury in either phase of his trial.

During the sentencing phase, Vasquez's counsel called three additional witnesses: Vasquez's aunt and uncle (his adoptive parents), and his sister, each of whom essentially begged the jury for mercy. Not one of them was asked to disclose any information regarding the role of Vasquez's biological parents in his life, his ongoing relationship with his biological father, his family's history of substance abuse and criminality, or any past or present mental disorders that may have affected Vasquez's childhood or development.

In affidavits submitted in connection with his state habeas petition, Vasquez's aunt and uncle each stated that none of Vasquez's attorneys had met with them to discuss possible mitigating evidence, and none prepared the Vasquezes to testify at sentencing. One of Vasquez's attorneys later admitted that counsel's only interviews with the Vasquez family to prepare the mitigation case were held in the courthouse hallway during the trial. They never spoke with Vasquez's biological parents at all. Neither did Vasquez's attorneys hire a mitigation specialist; rather, the court-authorized investigator they *did* hire, who had no experience investigating mitigating evidence in capital murder cases, spent just eight and a half hours working on the case, which included time spent traveling 110 miles.

Had Vasquez's trial attorneys undertaken even a rudimentary investigation of Vasquez's family and social history, they would have unearthed a frightening portrait of addiction and destruction. Vasquez's mother drank

heavily and regularly during her pregnancy, inflicting Vasquez with Fetal Alcohol Syndrome. Vasquez's father, Ricardo Vasquez, was a drug addict and lifelong foot soldier in the drug trade who spent much of his life in and out of prison for narcotics-related crimes. Ricardo maintained a close relationship with his son, refusing to allow Vasquez's clean-living aunt and uncle legally to adopt the boy. From the time Vasquez was a child, he witnessed his father using and dealing heroin, often from the front porch of their home. Ricardo took Vasquez with him to rob houses and taught Vasquez how to use and sell heroin. Vasquez began using marijuana when he was ten, and by thirteen he was addicted to heroin and cocaine. Vasquez's father was not the only corrupting influence: When Vasquez was eight, a paternal uncle who lived nearby was murdered in a drug-related homicide; when Vasquez was nine, another paternal uncle died of a drug overdose; three years later, yet another paternal uncle was murdered in narcotics-related violence.

When, at age fourteen, Vasquez's aunt and uncle tried to get him help for his substance abuse, Ricardo lured Vasquez back to a life of drugs and drug-trafficking by taking the boy along with him when he made deliveries as a drug runner and when he robbed houses. Even when Ricardo was incarcerated, Vasquez's environment fueled his addiction: His father's friends would seek him out and share their drugs with him; his sister Brenda, also a cocaine addict, had a series of boyfriends who sold heroin and who would supply Vasquez with whatever he wanted; even his biological mother, who lived nearby and had informally surrendered custody of Vasquez to his aunt and uncle, co-habited with a drug-dealer who provided Vasquez with drugs. The toxic combination of addiction and crime that pervaded Vasquez's family life and adolescence eventually took its toll. Neurological tests undertaken as part of his state habeas petition revealed that he suffered from brain dysfunction arising from multiple causes (including Fetal Alcohol Syndrome, actual trauma to the brain,

No. 08-70034

and drug abuse), cumulative post-traumatic stress disorder, learning disabilities, and a borderline low-normal IQ of 83. None of the foregoing mitigating evidence was discovered and presented to the sentencing jury by his counsel.

Vasquez appealed his conviction and sentence to the Texas Court of Criminal Appeals, which affirmed both.[6] While his direct appeal was still pending, Vasquez filed a state petition for habeas corpus in his trial court, asserting eleven grounds for relief, including those under consideration here. Following an evidentiary hearing, the trial court entered findings of facts and conclusions of law denying relief on all grounds. The Texas Court of Criminal Appeals adopted the trial court's findings and conclusions in an unpublished opinion and denied Vasquez's state application for the writ of habeas corpus.[7]

Following the exhaustion of his state remedies, Vasquez filed a federal habeas petition in the Southern District of Texas, advancing three claims for relief premised on violations of his Sixth Amendment right to the effective assistance of trial and appellate counsel. The district court denied relief on all three claims, but granted a certificate of appealability *sua sponte* on the two claims now before us: (1) whether trial counsel's investigation into mitigating evidence was so deficient and prejudicial as to violate his Sixth Amendment right; and (2) whether Vasquez's appellate attorney labored under an actual conflict of interest that deprived him of his Sixth Amendment right.[8]

## II.  ANALYSIS

**A.    Standard of Review**

---

[6] *Id.*

[7] *Ex parte Vasquez*, No. 59,201-01 (Tex. Crim. App. Jan. 26, 2005).

[8] *Vasquez v. Quarterman*, No. CC-06-059, 2008 WL 859147 (S.D. Tex. Mar. 28, 2008).

6

No. 08-70034

Because Vasquez's IAC claims were brought in the district court after April 24, 1996, they are governed by the provisions of the AEDPA.[9] We review the district court's interpretation of the AEDPA *de novo* and its findings of fact for clear error.[10] The AEDPA's deferential standard of review only applies to the state court's adjudication of a petitioner's claim on the merits,[11] a condition satisfied here.

IAC claims are mixed questions of fact and law, and thus are "reviewed under the 'contrary to' and 'unreasonable application' prong of 28 U.S.C. § 2254(d)."[12] A state court's decision is "contrary to" clearly established Supreme Court precedent when it "applies a rule that contradicts the governing law set forth in [the Court's] cases," or reaches an opposite conclusion from a Supreme Court case upon facts that are "materially indistinguishable."[13] A state court "unreasonably applies" clearly established federal law when it correctly identifies the governing law but unreasonably applies it to the facts of a

---

[9] 28 U.S.C. § 2254(d)(1)-(2).

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

[10] *Thompson v. Cain*, 161 F.3d 802, 805 (5th Cir. 1998). In a habeas petition, however, the state court's findings constrain the district court's determination of the facts. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. 2254(e)(1).

[11] 28 U.S.C. § 2254(d).

[12] *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002).

[13] *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (O'Connor J., concurring) (concurrence commanded a majority for the proposition cited).

7

particular case.[14] To warrant reversal, the state court's application of the law must be objectively, not subjectively, unreasonable.[15]

When the state court denies relief without issuing a written order or otherwise specifying its reasons, our inquiry under the AEDPA is not affected. Rather, we "(1) assume that the state court applied the proper clearly established federal law; and (2) then determines whether its decision was contrary to or an objectively unreasonable application of that law."[16]

**B.    Analysis**

**1.    The *Wiggins* claim**

Under the familiar standard set forth in *Strickland v. Washington*,[17] a petitioner claiming ineffective assistance of counsel must prove that (1) counsel's performance fell below the objective, professional standard of reasonableness, *and* (2) such deficient performance prejudiced the defense. To establish prejudice, the petitioner must show that "but for counsel's unprofessional errors, the result of the proceeding would have been different."[18]

**a.    Deficient performance**

In *Wiggins v. Smith*,[19] the Supreme Court recognized that, in a capital case, counsel's performance may be deficient if it does not include an adequate investigation into mitigating evidence, including research into a capital

---

[14] *Id.* at 407-09.

[15] *Id. Accord Schiro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable–a substantially higher standard.").

[16] *Jordan v. Dretke*, 416 F.3d 363, 367-68 (5th Cir. 2005) (internal citations and marks omitted).

[17] 466 U.S. 668, 687-88 (1984).

[18] *Mickens v. Taylor*, 535 U.S. 162, 166 (2002).

[19] 539 U.S. 510 (2003).

defendant's "*family and social history*."[20]  The Texas Court of Criminal Appeals held that Vasquez's attorneys' performance was neither deficient nor prejudicial. Thereafter, the federal district court held that counsel's performance was constitutionally deficient, but that it did not prejudice Vasquez's defense.  On appeal to us, Vasquez challenges the district court's conclusion regarding prejudice by identifying several ways in which the district court allegedly misapplied the applicable prejudice analysis.  Before us, the government does not contest the district court's conclusion that counsel's performance was deficient;[21] instead, the government contends that the district court correctly interpreted and applied the *Strickland* standard of prejudice. Consequently, our task is confined to determining (1) whether it was objectively unreasonable for the Texas Court of Criminal Appeals to conclude that the outcome of Vasquez's capital sentencing would *not* have been different if his trial counsel had investigated (and, presumably, presented) evidence of his family life and social history, including his mental impairments, and (2) whether the district court erred as a matter of law in its application of *Strickland*.

### b.    Prejudice

Under *Strickland* and its progeny, Vasquez must demonstrate that, but for counsel's failures to investigate and present evidence of his family life and social history, there is a "reasonable probability" that a jury would not have

---

[20]    *Id.* at 524 (recognizing as the applicable standard of professional conduct the American Bar Association Standards for Criminal Justice); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (same).

[21]    We have already held that "[g]enerally accepted standards of competence require that counsel conduct an investigation into [a defendant's] background." *Smith v. Quarterman*, 515 F.3d 392, 405 (5th Cir. 2008).

sentenced him to death.[22]    A reasonable probability is "a probability sufficient to undermine confidence in the outcome."[23]

Vasquez essentially insists that the district court erred in its application of the *Strickland* standard because it failed to consider how the evidence of his family life and background would have affected the totality of the evidence presented to the sentencing jury regarding his culpability.  He contends that, contrary to Texas and federal law,[24] the district court employed several erroneous modes of analysis, including (1) improperly "weighing" mitigating evidence against aggravating evidence; (2) improperly assessing the evidence of Vasquez's childhood and mental impairments in a "threshold-based analysis" against the depravity suffered by the successful habeas petitioners in *Wiggins* and *Rompilla*; (3) improperly discounting the evidence of mental impairment as "double-edged"; and (4) misconstruing the petitioner's standard of proof when it held that Vasquez had to establish prejudice by "clear and convincing evidence." We address each contention in turn.

---

[22]  *Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

[23]  *Id.*

[24]    As a threshold matter, we note that Vasquez's claim that the district court misapplied *Texas* law must implicate a violation of a federal right if it is to be cognizable on federal habeas review.  *Hankins v. Quarterman*, 288 Fed. App'x  952, 960 n.28 (5th Cir. 2008) (citing *Smith v. McCotter*, 786 F.2d 697, 702-03 (5th Cir. 1986) (citing *Baldwin v. Blackburn*, 653 F.2d 942, 948 (5th Cir. 1981), *cert. denied*, 456 U.S. 950, *reh'g denied*, 457 U.S. 1112 (1982) (holding that a failure to comply with state law requirements presents a federal habeas issue only if it involves federal constitutional issues))). The Texas mitigation special issue instruction tracks the constitutional requirement articulated in *Penry v. Lynaugh*, in which the Court held that a defendant has a right to "[sentencing] instructions informing the jury that it could consider and give effect to the mitigating evidence of [petitioner's]  [mental infirmities] and . . . background by declining to impose the death penalty, [as a ] . . . . vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision." *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989).  Inasmuch as the Texas mitigation special issue was modeled on *Penry* to ensure compliance with federal constitutional law, Vasquez's claim is cognizable on federal habeas review.

No. 08-70034

*i.    Improper weighing of evidence*

The Supreme Court has long recognized that a state may employ any procedure it chooses to administer the death penalty as long as that procedure meaningfully "limit[s] the class of murderers to which the death penalty may be applied."[25]  Once this limiting condition has been satisfied, all states ask "the sentencer . . . to determine whether a defendant thus found eligible for the death penalty should in fact receive it.  Most States channel this function by specifying the aggravating factors (sometimes identical to the eligibility factors) that are to be weighed against mitigating considerations."[26] State practices diverge here, as some permit the sentencer to consider aggravating circumstances that are not included in the list of aggravating circumstances that made the defendant death-penalty eligible initially.[27] Regardless of the differences between state practices, however, the only federal constitutional requirement is that "in *all* capital cases the sentencer must be allowed to weigh the facts and circumstances that arguably justify a death sentence against the defendant's mitigating evidence."[28] To comply with this standard, Texas law instructs the sentencer to consider "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating

---

[25]   *Brown v. Sanders*, 546 U.S. 212, 216 (2006) (analyzing different state capital sentencing schemes in the context of determining "what happens when the sentencer imposes the death penalty after at least one valid eligibility factor has been found, but under a scheme in which an eligibility factor or a specified aggravating factor is later held to be invalid.").

[26]   *Id.*

[27]   *Id.* (observing same).

[28]   *Id.* 216-17.

No. 08-70034

circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed."[29]

This was precisely the analysis undertaken by the district court in this case. After undertaking an extensive review of the evidence in mitigation, the court went on to note the other evidence put before the jury regarding (1) the victim's youth; (2) the undisputed fact that she died while in Vasquez's sole care from blows to the head that "were equivalent to a 65 m.p.h. car accident;" (3) the fact that she had lethal quantities of cocaine in her system; (4) the significant evidence of some type of sexual assault; and (5) evidence of other wounds on her body that pointed to a history of physical abuse. To guide its assessment of the post-conviction record of evidence in aggravation and in mitigation, the district court properly looked to cases in which the Supreme Court had applied this very standard.[30] The district court then concluded that Vasquez's background, "though terrible," would not have so altered a jury's perception of his moral culpability that the Texas Court of Criminal Appeals had *unreasonably* erred—the standard imposed by AEDPA—in its conclusion that a jury would have convicted Vasquez to death anyway.

    *ii.    Comparing instant evidence with that in* Wiggins *and* Rompilla

We deem unavailing Vasquez's claim that the district court erroneously "weighed" the mitigating evidence against the aggravating evidence, or committed error when it compared the mitigating evidence in Vasquez's case to that of successful *Wiggins* petitioners. The Supreme Court instructs courts to consider "the totality" of mitigating evidence–both the evidence adduced at sentencing and evidence that was omitted or went undiscovered—in its prejudice

---

[29] TEX. CRIM. PROC. CODE ANN. art 37.071 § 2(e) (Vernon 1997).

[30] *Vasquez v. Quarterman*, No. CC-05-059, 2008 WL 859147, at *11-12 (S.D. Tex., March 28, 2008).

analysis.[31] The Texas Code of Criminal Procedure instructs a sentencing jury similarly.[32]    Consequently, there is no prescribed or proscribed procedure—"balancing," "weighing," or otherwise—by which a jury (or a court) must analyze the mitigation evidence under either Texas[33] or federal law,[34] so long as both the newly discovered mitigation evidence and the original mitigation evidence is taken into consideration. Naturally, the power of the newly amplified case to mitigate a jury's selected punishment will be contingent on other factors in the case, such as the circumstances of the crime. We have, therefore, repeatedly upheld the commonsense notion that the relative mix of mitigating and aggravating evidence must be reassessed when a court engages

---

[31] *Williams v. Taylor,* 529 U.S. 362, 397-98 (2000) (holding that the state supreme court erred when it "failed to evaluate the totality of the available mitigation evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation").

[32] The Texas statute requires a jury to consider:
Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.
TEX. CRIM. PROC. CODE ANN. art 37.071 § 2(e) (Vernon 1997).

[33] *Mosley v. State*, 983 S.W.2d 249, 263 n.18 (Tex. Crim. App. 1998) (instructing that "[w]hile the[ ] cases have some language indicating that the mitigation question does not involve aggravating circumstances, such language should properly be viewed as simply observing that the issue does not require their consideration. Such an observation does not, however, preclude permitting the jury to consider aggravating factors in making its evaluation . . . the jury is not, and should not be, required to look at mitigating evidence in a vacuum . . . ."); *accord Ex parte Gonzalez*, 204 S.W.3d 391, 394 (Tex. Crim. App. 2006) (noting that "Texas's capital sentencing scheme does not involve the direct balancing of aggravating and mitigating circumstances. It asks the jury to answer a mitigation question.").

[34] *Tuilaepa v. California,* 512 U.S. 967, 979-80 (1994) (holding that "[a] capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision" and reaffirming that "the sentencer may be given 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty'" ) (citing *Zant v. Stephens*, 462 U.S. 862, 875 (1983)).

in a *Strickland* prejudice analysis.[35]  Vasquez is correct that, in support of its balancing approach to prejudice analysis, the district court relied on two cases that were decided *before* the Texas statute was amended to reflect *Penry*'s insistence that juries be allowed to consider the effect of mitigating evidence on general moral culpability.[36]  Nevertheless, our review of the district court's analysis in its entirety leads us to conclude that its citation to two stale cases does not trump the fact that its analysis properly considered the potential impact of the omitted mitigation evidence on the jury's sentencing determination in conformity with prevailing Texas and Supreme Court precedent.

With respect to Vasquez's claim that the district court erred in comparing the mitigating evidence in Vasquez with that of other (successful) habeas petitioners who had brought similar claims, nothing in *Wiggins, Rompilla*, or *Williams* suggests that a court may not, in its assessment of prejudice stemming from uninvestigated mitigating evidence, engage in the kind of "cross-case comparison" that is the foundation of common law reasoning.  On the contrary, we have noted that prejudice analysis "is illumined, although not necessarily controlled by, a comparison with cases in which the Supreme Court determined whether there was a reasonable probability that the trial attorneys' failure to

---

[35] *Wood v. Quarterman*, 491 F.3d 196, 203 (5th Cir. 2007) (holding that *Wiggins* requires the court to "reweigh[] the evidence in aggravation against the totality of the available mitigating evidence"); *Blanton v. Quarterman*, 543 F.3d 230, 239 (5th Cir. 2008) ("In reviewing the issue of prejudice at capital sentencing we weight the quality and quantity of the available mitigating evidence, including that presented in post-conviction proceedings, along with any aggravating evidence.")).

[36] *Vasquez v. Quarterman*, No. CC-05-059, 2008 WL 859147, at *11 (S.D. Tex., March 28, 2008) (citing *Jones v. Johnson,* 171 F.3d 270 (5th Cir. 1999) (applying pre-1991 sentencing statute); *Russell v. Lynaugh*, 892 F.2d 1205 (5th Cir. 1989) (same)).

discover and present mitigation evidence had affected the outcome of the sentencing proceedings."[37]

###### iii. Evidence of mental impairment as "double-edged"

Vasquez's claim that the district court misconstrued the standard of prejudice applicable to newly-discovered evidence of mental impairment is predicated on a faulty interpretation of the district court's reasoning. Vasquez's argument is somewhat unclear: He appears to argue that the court misconstrued the prejudice standard because its analysis was incorrectly driven by deference to counsel's strategic choice not to present evidence of mental impairment in light of the fact that such evidence can be double-edged. This, however, mischaracterizes the district court's reasoning and the governing legal standard. The court assumed that the performance of Vasquez's counsel was deficient for failing to investigate evidence that Vasquez suffered from post traumatic stress disorder, attention deficit disorder, drug addiction, Fetal Alcohol Syndrome, learning disabilities, and a borderline I.Q. The court then reasoned that "[r]egardless of whether defense counsel should have pursued . . . additional . . . tests [for mental impairment]," even if evidence of mental impairment *were* added to the case for mitigation, the "overwhelming evidence of guilt and the brutality discussed" rendered it unlikely that the mental impairment evidence would have so "altered the jury's balancing of aggravating or mitigating factors."[38] The district court correctly noted that evidence of mental impairment "certainly helps to explain Vasquez's violent outburst against Miranda" and that it "could elicit the jury's sympathy."[39] That court thus clearly contemplated the

---

[37] *Sonnier v. Quarterman*, 476 F.3d 349, 360 (5th Cir. 2007) (comparing impact of petitioner's excluded mitigation evidence by reference to mitigation evidence in *Williams* and *Rompilla*).

[38] *Vasquez*, 2008 WL 859147 at *22.

[39] *Id.* at *12.

explanatory power and, implicitly, the exculpatory power of the mental-impairment evidence.  In so doing, the court's reasoning is entirely in keeping with governing Supreme Court law and the law of this circuit.

The Supreme Court has held that evidence of mental impairment can be both mitigating and aggravating,[40] and we have repeatedly rejected IAC claims "where alleged failures to investigate mitigating evidence did not prejudice the defendant because of the double-edged nature of the evidence available."[41] Thus, the district court did not misperceive or misapply the relevant standard of *Strickland* prejudice, and Vasquez has not offered any other grounds from which we could conclude that the state court's prejudice determination was objectively unreasonable.  We perceive no error, either on the part of the state court or the federal district court.

### iv.    Standard of proof of prejudice

Vasquez next contends that the district court assigned him the incorrect standard of proof when it stated that he had to establish prejudice by "clear and convincing evidence."[42]  Under the AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."[43]  Nevertheless, "[o]n questions of law, as well as mixed questions of

---

[40] *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002) (noting that "mental retardation and history of abuse is thus a two-edged sword: it may diminish [petitioner's] blameworthiness for [the] crime even as it indicates that there is a probability that he will be dangerous in the future").

[41] *Cockrum v. Johnson*, 119 F.3d 297, 304-05 (5th Cir. 1997) (collecting cases).

[42] *Vasquez*, 2008 WL 859147 at *12-13 (noting that "Petitioner fails to demonstrate by clear and convincing evidence that the state court's finding [that evidence of Vasquez's mental impairments would not have been reasonably likely to lead the jury to withhold the death penalty] is unreasonable.").

[43] 28 U.S.C. § 2254(e)(1).

law and fact, the district court was required, under AEDPA, to defer to the state-court's decision unless it 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.'"[44] "An ineffective assistance of counsel claim presents a mixed question of law and fact."[45]

Based on the foregoing, the district court erred when it stated that "Petitioner fails to demonstrate by clear and convincing evidence that the state court's finding is unreasonable."[46] Moreover, this error is revealed in the district court's own opinion. In its initial articulation of the standard of review, the court expressly identified the correct standard under the AEDPA, and went on to conclude, after its review of the newly adduced mitigating evidence, that "Vasquez fails to demonstrate a reasonable probability that the mitigating evidence would have altered the jury's balancing of aggravating and mitigating factors" and that, therefore, "[t]he State Court's rejection of this claim was neither 'contrary to' nor an 'unreasonable applicable of' clearly established federal law." These additional statements by the district court, articulating and assigning the correct burden to petitioner, lead us to conclude that it was a simple drafting error that made it appear as though the district court had engrafted the heightened "clear and convincing" evidence standard of proof onto the objective unreasonableness standard mandated by the AEDPA. Even though we recognize that this drafting error incorrectly stated the governing standard of proof, we affirm the district court's ruling on Vasquez's *Wiggins* claim because,

---

[44] *Bartee v. Quarterman*, 339 Fed. App'x 429, 432 (5th Cir. 2009) (internal citations omitted); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.").

[45] *Ward v. Dretke*, 420 F.3d 479, 486 (5th Cir. 2005).

[46] *Vasquez*, 2008 WL 859147 at *12-13.

under the correct standard, Vasquez has not proven that the state court's prejudice determination was objectively unreasonable.

## 2.    IAC predicated on appellate counsel's conflict of interest

Vasquez also asserts an IAC claim against his appellate counsel, insisting that his attorney on appeal labored under an actual conflict of interest because he simultaneously served as a special prosecutor seeking to uphold two unrelated capital convictions for the same district attorney's office that prosecuted Vasquez.  The state court's conclusion that no actual conflict existed is a conclusion of law,[47] and as such it is subject to the "contrary to" or "unreasonable application" standard of review under the AEDPA.

To obtain relief based on counsel's conflict of interest, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."[48] Importantly, the mere "*possibility* of conflict is insufficient to impugn a criminal conviction."[49] In *Mickens v. Taylor*, the Supreme Court explained that

> we think 'an actual conflict of interest' mean[s] precisely a conflict *that affected counsel's performance*–as opposed to a mere theoretical division of loyalties.  It was shorthand for the statement [in *Cuyler*] that 'a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. . . .Thus, the [*Cuyler*] standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect.  An 'actual

---

[47] *Cuyler v. Sullivan,* 446 U.S. 335, 342 (1980).

[48]  *Id.* at 348.  Note here that Vasquez *was unaware* that counsel simultaneously represented the Nueces district attorney's office in other capital appeals, and the record does not indicate that this fact was divulged to the appellate court.

[49]  *Id.* (emphasis added).

No. 08-70034

conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.[50]

This circuit has further refined the *Cuyler* inquiry by requiring that "[a] defendant must show more than a speculative or potential conflict;"[51] to meet this standard requires that "it . . . be demonstrated that the attorney made a choice between possible alternative courses of action . . . . If he did not make such a choice, the conflict remained hypothetical."[52]  Relevant factors may include (1) whether the attorney had confidential information that was helpful to one client but harmful to the other client; (2) whether and how closely related were the subject matters of the cases; (3) how close in time the multiple representations occurred; and (4) whether the prior representation has terminated.[53]  Ultimately, however, we have noted before that "*Cuyler*'s 'actual conflict' and 'adverse effect' elements have been described as 'rather vague'" and such a determination is therefore "tightly bound to the particular facts."[54]

Vasquez's conflict-based IAC claim may be reduced to the assertion that, because the interests of a criminal defendant and the office of the prosecutor that convicted him are inescapably adverse, his appellate attorney was, *ex definitio*, actively representing conflicting interests.  All the authorities that Vasquez cites involved a defense attorney's present representation of a defendant and the past representation (civil or criminal) of a witness for the

---

[50] *Mickens v. Taylor*, 535 U.S. 162, 164 (2002) (addressing "what a defendant must show in order to demonstrate a Sixth Amendment violation where the trial court fails to inquire into a potential conflict of interest about which it knew or reasonably should have known.")

[51]  *United States v. Garcia-Jasso*, 472 F.3d 239, 243 (5th Cir. 2006).

[52]  *Id.* (citing *Beets v. Scott*, 65 F.3d 1258, 1277 (5th Cir. 1995) (en banc).

[53]  *U.S. v. Burns*, 526 F.3d 852, 856 (5th Cir. 2008).

[54]  *Perillo v. Johnson*, 205 F.3d 775, 782 (5th Cir. 2000) (citing *Beets*, 65 F.3d at 1265).

prosecution in the defendant's ongoing criminal trial.[55]   Consideration of the particular situation presented here—a special prosecutor who *simultaneously* serves as a capital defense attorney in the same jurisdiction—appears to be *res nova* in this circuit, and, indeed, in all but one other circuit.  It appears that only the Seventh Circuit has addressed this particular type of conflict, and it squarely rejected the argument that Vasquez advances here.  In *Small v. Endicott,* the Seventh Circuit held that a pro se defendant failed to demonstrate the existence of a cognizable actual conflict under the Sixth Amendment because he did not point to anything other than the fact "that his attorney served as a special prosecutor in an unrelated murder" in the same jurisdiction while he was defending the petitioner.[56]   The *Small* court reasoned that "we do not find a conflict of interest where there exist separate and distinct criminal cases involving neither the same parties nor facts."[57]

We do not today suggest that an arrangement such as the one presented here could not, under different circumstances, present an actual conflict,[58] but we cannot conclude on the record before us that the state court's conclusion was

---

[55] *United States v. Martinez*, 630 F.2d 361, 363 (5th Cir. 1980); *Stephens v. United States*, 595 F.2d 1066, 1066 (5th Cir. 1979); *Zuck v. Alabama*, 588 F.2d 436, 439 (5th Cir. 1979); *Castillo v. Estelle*, 504 F.2d 1243 (5th Cir. 1974) .

[56] 998 F.2d 411, 417 (7th Cir. 1993).

[57] *Id.*

[58] *See, e.g., Burger v. Kemp*, 483 U.S. 776, 784-85 (1987).  In *Kemp*, the Court treated partners in a law firm who represented different defendants in different trials involving a single criminal transaction as a single attorney for conflicts purposes.  "The two partners [had] shared their legal research and discussed the cases with one another," and the respective theories of each co-defendant "sought to emphasize the culpability of the other in order to avoid the death penalty." *Id.* at 780.  Although the Court "assum[ed] without deciding" that two law partners are considered one attorney for the purposes of the conflicts analysis, *Kemp* nevertheless suggests that a special prosecutor and a prosecutor may be treated as law partners—and therefore, have one another's loyalties and conflicts imputed to the other—under certain circumstances.

objectively unreasonable. As in *Small v. Endicott*, Vasquez's appellate counsel served as a special prosecutor in totally "separate and distinct" capital cases. Further, Vasquez does not allege that his counsel possessed confidential, "zero-sum" information that would have aided his defense but would have required his attorney to breach a duty to the Nueces County district attorney's office. Bearing in mind that the only circuit to have considered such a fact pattern held that it did not rise to the level of an actual conflict, we conclude that, under the highly deferential standard of review imposed by the AEDPA, the state court was not objectively unreasonable in holding that, without more, appellate counsel's simultaneous service as a special prosecutor in unrelated capital cases did not establish an actual conflict under prevailing federal law as established by the Supreme Court.

### III. CONCLUSION

We hold that although it was objectively unreasonable for the state court to conclude that Vasquez's trial counsel's performance was constitutionally sound, Vasquez was not prejudiced by his trial counsel's deficient performance. We also hold that it was not objectively unreasonable for the state court to conclude that Vasquez's appellate counsel did not labor under an actual conflict of interest. The judgment of the district court denying habeas relief to Vasquez is, therefore,

AFFIRMED.